MICHAEL W. PATIN AND SANDRA H. PATIN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 31925-83, 7434-84, Filed April 29, 1987.
9257-84, 15992-84,
16937-84.

---

[1]Cases of the following petitioners are consolidated herewith: Gordon W. Hatheway, Jr., and Barbara S. Hatheway, docket No. 7434-84; Arthur Espy, docket No. 9257-84; Edward N. Gomberg and Helen E. Gomberg, docket No. 15992-84, and William S. Skeen and Alison Skeen, docket No. 16937-84.

*David A. Aughtry*, for the petitioners.
*Ana G. Cummings* and *Bernard B. Nelson*, for the respondent.

FEATHERSTON, *Judge*: These consolidated cases were assigned to Special Trial Judge Marvin F. Peterson pursuant to section 7456(d)[2] (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1556, 100 Stat. 2755), and Rules 180, 181, and 183.[3] The Court agrees with and adopts his opinion which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

PETERSON, *Special Trial Judge*: These consolidated cases were selected by counsel and approved by the Court to

---

[2] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated.

[3] All Rule references are to the Tax Court Rules of Practice and Procedure.

serve as test cases for resolving issues common to a much larger group of petitioners who invested during 1980 in the "Gold Ore Purchase and Mining Program" marketed by Omni Resource Development Corp. Respondent determined deficiencies and additions to tax in petitioners' 1980 Federal income taxes as follows:

| Docket No. | Petitioner | Deficiency | Addition to tax I.R.C. 1954, sec. 6653(a) |
|---|---|---|---|
| 31925-83 | Michael W. Patin and Sandra Patin | $49,807.92 | 0 |
| 7434-84 | Gordon W. Hatheway, Jr., and Barbara S. Hatheway | 11,729.41 | 0 |
| 9257-84 | Arthur Espy | 19,121.25 | 0 |
| 15992-84 | Edward N. Gomberg and Helen E. Gomberg | 71,719.66 | $3,635.90 |
| 16937-84 | William S. Skeen and Alison Skeen | 20,000.00 | 1,000.00 |

The issues for decision are (1) whether and to what extent petitioners are entitled to deductions for mining development expenditures under section 616 or, in the alternative, for mining exploration expenditures under section 617, (2) whether petitioners Gomberg (docket No. 15992-84) and Skeen (docket No. 16937-84) are liable for additions to tax under section 6653(a) as set forth above, and (3) whether petitioners are liable under section 6621(d)[4] for additional interest with respect to tax-motivated transactions. This last issue was raised by respondent by amended answers in these cases.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and exhibits attached thereto are incorporated herein by this reference. At the time their respective petitions were filed, petitioners Michael W. Patin and Sandra H. Patin resided in Houston, Texas; petitioners Gordon W. Hatheway, Jr., and Barbara S. Hatheway resided in Fairfax, Virginia; petitioner Arthur Espy resided

---

[4]Sec. 6621(d) has been redesignated as sec. 6621(c), effective Jan. 1, 1987, pursuant to sec. 1511(c)(1), Tax Reform Act of 1986, 100 Stat. 2744.

in Dallas, Texas; petitioners Edward N. Gomberg and Helen E. Gomberg resided in Hixon, Tennessee; and petitioners William S. Skeen and Alison Skeen resided in Irvine, California.

*General Overview of Gold Program*

Omni Resource Development Corp. (Omni) was formed March 17, 1980, under the laws of the State of Delaware. American International Mining Co., Inc. (AMINTCO) was formed under Delaware law on April 14, 1980. During 1980, Dr. Phillip A. Myers (Myers) and Elwood E. Parrish (Parrish) each owned 50 percent of the capital stock of each corporation.

The deductions in dispute in these cases arise out of the participation of petitioner-husbands and petitioner Espy (hereinafter petitioners, unless otherwise indicated) in Omni's "Gold Ore Purchase and Mining Program" (sometimes hereinafter referred to as the gold program). The gold program was organized and promoted through the efforts of Myers and Parrish during 1980 ostensibly to mine gold and silver ore from the "Shamrock" and "Encino Vivo" lode claims located near Silver City in southwestern New Mexico. Neither Myers nor Parrish had any previous gold mining experience at the time they organized the Omni gold program.

The gold program was promoted as providing a tax deduction equaling 6 times the cash invested in 1980 by prospective investors. The offering materials (hereinafter referred to as the prospectus) petitioners received contained the following description of the gold program:

*Structure of the Program* — For a PRINCIPAL[5] who wishes to both mine gold and silver and generate a large 1980 tax loss, the program would work as follows. If the PRINCIPAL wishes, as an example, to generate a $60,000 ordinary tax loss in 1980, he would first buy 1,200 tons of gold-bearing ore from OMNI — at a total cost of $50 plus a 50% royalty of the gold and silver contents. Second, the PRINCIPAL would sign a $60,000 contract with American International Mining Co., Inc. ("AMINTCO") to develop the mine site for the 1,200 tons, and to then mine and process the ore all the way to bullion. The $60,000 contract

---

[5]Investors in the gold program were referred to as "principals" in the prospectus.

would be paid by the PRINCIPAL with $10,000 in cash, and the proceeds of a $50,000 ten year recourse note. In a typical case, part of the bullion produced would be sold to repay the note, over a five year period.

The prospectus detailed the tax benefits of the gold program in several places, including the following description in question-and-answer form:

WHAT IS THE TAX WRITE-OFF (ALSO CALLED THE REDUCTION OF ADJUSTED GROSS TAXABLE INCOME) FOR THE 1980 TAX YEAR?

The tax write-off or reduction of adjusted gross taxable income is 6 to 1.

WHAT DOES 6 to 1 MEAN?

This means that the write-off or reduction of adjusted gross taxable income is 6 times your *cash* outlay.

HOW IS THIS DERIVED?

We shall use a simple example of a Principal who has $10,000 in cash, needs to shelter $60,000 in other income during 1980, and wants to make a very handsome return on his cash. This Principal would buy 1,200 tons of gold and silver bearing ore from Omni Resource Development Corporation ("OMNI"), which owns the Shamrock and Encino Vivo gold lodes in New Mexico. The cost to the Principal would be $50. [sic] plus 50% of the gold and silver contents processed from the ore. The Principal now owns the ore. If the Principal wishes to get the maximum tax advantage, he would next contract with American International Mining Co., Inc. ("AMINTCO") to develop his mine site, and process his ore. The Principal pays AMINTCO $50 per ton for mine development, or $60,000 in total (1,200 tons × $50. = $60,000). OMNI has made arrangements for Kensington Financial Corporation to loan Principals 5/6 of this development expense, or $50,000 in this case, at 10% simple interest, on a ten year note. The Principal will borrow this $50,000 by signing a note to Kensington, and directing Kensington to pay the money directly to AMINTCO. The $10,000 in cash plus the $50,000 borrowed equals $60,000, which gives the 6 to 1 writeoff. The tax code clearly states that mine development expenses (the $60,000) are deductable in full in the year in which incurred, thus the Principal can deduct the entire $60,000 in 1980.

\* \* \* \* \* \* \*

Following are the tax savings you could expect in 1980, assuming you fully shelter your other income with this program. All figures are in dollars.

|  | Net taxable income | Federal | State | Total | Cash[6] savings |
|---|---|---|---|---|---|
| Married— | $42,000 | $16,319 | $3,360 | $19,679 | $12,679 |
| separate | 60,000 | 27,164 | 5,400 | 32,564 | 23,564[sic] |
| return | 84,000 | 42,636 | 8,400 | 51,036 | 37,036 |
|  | 150,000 | 88,362 | 15,500 | 103,682 | 78,682 |
| Married— | 42,000 | 11,086 | 2,940 | 14,026 | 7,026 |
| joint | 60,000 | 19,678 | 4,200 | 23,878 | 13,878 |
| return | 84,000 | 32,638 | 7,560 | 40,198 | 26,198 |
|  | 150,000 | 73,528 | 15,000 | 88,528 | 63,528 |
| Single | 42,000 | 13,667 | 3,360 | 17,027 | 10,027 |
|  | 60,000 | 23,943 | 5,400 | 29,343 | 19,343 |
|  | 84,000 | 39,173 | 8,400 | 47,573 | 33,573 |
|  | 150,000 | 84,887 | 16,500 | 100,387 | 75,387 |

The federal taxes, above, are taken from tax tables, and State taxes are estimated. If you have no State taxes, you are very fortunate.

Additionally, the prospectus included materials generally describing the financial aspects of the gold program, the history of the Shamrock and Encino Vivo properties, and literature concerning then current projections of gold price trends. Also included with the prospectus were the following documents:

1. — Tax opinion letter by the Los Angeles law firm of Warner, Sannes & Greenberg.
2. — Securities opinion letter by John A. Karayan, Esq. of Burbank, California.
3. — "Purchase Agreement."
4. — "Mining Agreement."
5. — "Promissory Note and Security Agreement."
6. — "Purchaser Questionnaire."
7. — "Principal Information and Instruction Sheet."

The tax opinion letter concluded that the proposed mining development fee would be deductible in its entirety during the 1980 tax year. The opinion letter stated that it was based upon the law applicable to the facts and representa-

[6]The figures in the "cash savings" column are apparently derived by subtracting an investor's required cash payment to AMINTCO from the tax savings to be received. For example, an investor wishing to fully shelter $150,000 of taxable income would make a one-sixth cash payment of $25,000 to AMINTCO and sign a note for the remaining $125,000. Assuming the investor is married and files a joint income tax return, the chart shows tax savings of $88,528. "Cash savings" is thus derived as follows: $88,528 - $25,000 = $63,528.

tions as made to its author by Parrish, and that no effort was made to verify such facts and representations.

The securities opinion letter concluded that the structure of the gold program was such that the purchase agreement "should not be classified as a security under current Federal or California law." The purchaser questionnaire included in the prospectus elicited information concerning investors' income, net worth, and investment experience.

Under the purchase agreement, Omni purported to sell discrete ore blocks to the individual investor and permit him either to mine such blocks himself or to contract to have them mined by a "reputable" mining services contractor. If an investor chose to mine the ore himself he was required by the agreement to post a $10,000 bond in favor of Omni. The purchase agreement required that mining operations be commenced within 1 year and completed within 6 years from the date of such agreement. In addition, the purchase agreements executed by petitioners Patin, Skeen, and Espy provided that the ore sold would be "designated by blocks of ore six feet wide, one hundred feet deep from the surface, and generally not less than eight feet long * * * randomly selected from areas of the mine site believed by SELLER to contain commercial quantities of ore" and that such ore blocks would then be precisely mapped, physically marked on the mine site, and recorded in the purchaser's name.

The purchase agreement also called for a total purchase price of $50 (without regard to the number of tons of ore purchased). Additionally, Omni was granted an overriding royalty of 50 percent with respect to gold and silver bullion mined and processed from the property. The agreement further provided that in the event the initially purchased ore block(s) did not produce gold and silver worth at least $220 per ton, Omni would then sell an equivalent amount of ore to the buyer for an additional $50 (plus a 50-percent overriding royalty), and would mine and process such ore at no additional cost to the buyer. The purchase agreement further required that Omni bear the cost of all environmental and conservation expenditures. The purchase agreement did not, however, include a legal description of the mining

claim or claims purportedly sold, nor did it specifically mention by name either the Shamrock or Encino Vivo claims.

Concurrent with the execution of their respective purchase agreements, each of the petitioners executed a "mining agreement" and a "promissory note and security agreement."[7] Investors were to pay $50 per ton for development, and $5 per ton for extraction, processing, refining, and shipping of the ore. The minimum development fee was set at $30,000 ((600 tons of ore) $\times$ ($50 per ton)), payable upon execution of the agreement. The extraction fee was payable upon extraction of an investor's gold and silver bullion. AMINTCO promised under the mining agreement to develop, and then to extract, an investor's ore before performing such services with respect to any investor who subsequently executed a mining agreement with AMINTCO.

Under the mining agreement, an investor could either pay the entire development fee in cash upon execution of the agreement, or pay one-sixth of it to AMINTCO and "simultaneously * * * execute a note in favor of and borrow from Kensington Financial Corporation * * * the balance of the cost of said mining development." AMINTCO was authorized under the mining agreement to receive payment of the proceeds of such note directly from Kensington. Further, AMINTCO warranted that it and Kensington were independent organizations with no interest in the proceeds of the venture, except for Kensington's interest as a creditor. Finally, the mining agreement provided that all costs to meet requirements imposed by any governing body would be borne "solely by AMINTCO and/or Omni," and AMINTCO warranted that meeting such requirements would not delay its performance under the contract.

The mining agreement executed by petitioner Patin included three additional provisions: (1) A declaration that AMINTCO was an independent contractor; (2) a provision requiring AMINTCO to carry casualty insurance covering personal injury and property damage, and requiring that

[7]The documents executed by petitioners Gomberg and Hatheway were actually entitled "Mining and Security Agreement" and "Promissory Note," respectively, but contained essentially the same language as those executed by petitioners Patin, Skeen, and Espy.

AMINTCO provide petitioner with certificates of insurance prior to commencing any work under the contract; and (3) an agreement by AMINTCO to hold petitioner harmless with respect to any damages and costs arising out of violations of law, statute, or regulations of any governing body.

During the year in issue, petitioners each invested cash and executed promissory notes in the following amounts:

| Petitioner/docket No. | Cash invested | Promissory note | Total[8] |
|---|---|---|---|
| Michael W. Patin, docket No. 31925-83 | $15,000 | $75,000 | $90,000 |
| Gordon W. Hatheway, Jr., docket No. 7434-84 | 5,000 | [9]25,000 | 30,000 |
| Arthur Espy, docket No. 9257-84 | 12,000 | 60,000 | 72,000 |
| Edward N. Gomberg, docket No. 15992-84 | 20,000 | 100,000 | 120,000 |
| William S. Skeen, docket No. 16937-84 | 5,000 | 25,000 | 30,000 |

The "promissory note and security agreement" (the note) executed by each petitioner was a 10-year note calling for simple interest at a rate of 10 percent per annum (12 percent in the cases of petitioners Hatheway and Espy).[10] The terms of the note required prepayment during years in which mining took place, in the amount of 50 percent of gross proceeds. The note provided that it was recourse as to principal, nonrecourse with respect to interest. Kensington was granted a secured interest in the maker's ore and any gold or silver proceeds from such ore. The note provided that it was to be governed by California law and that any action to enforce the note must be brought in the State of California. Additionally, the notes executed by petitioners Patin, Espy, and Skeen contained the following language:

Lender warrants that it has no interest other than as a creditor in any activities of MAKER, OMNI, or the mining contractor, if any, which MAKER has employed.

---

[8]Petitioners each deducted their total contract amount as "mining development expenses" on Schedule C of their respective returns.

[9]The promissory note executed by petitioner Hatheway was not dated and did not state the amount borrowed and owed. However, the check from Kensington to AMINTCO with respect to petitioner Hatheway was in the amount of $25,000.

[10]Notes executed after Nov. 30, 1980, provided for the higher interest rate.

*Funding the Promissory Notes*

Kensington Financial Corp. was incorporated in Delaware by Harvey J. Levitan (Levitan) on May 19, 1980.[11] Pursuant to a verbal agreement between Myers and Levitan, Levitan was to act through Kensington as a loan broker, taking loan applications of gold program investors and attempting to fund such loans through unrelated financial institutions. Levitan was to receive a 1-percent fee for loans funded through his efforts.

After incorporating Kensington, Levitan placed in storage its certificate of incorporation and the accompanying corporate kit (including, among other things, a corporate minute book, corporate seal, and blank stock certificates), and awaited further instructions from Myers. However, sometime between July and September of 1980, Levitan decided to withdraw from the deal because of other business commitments which had arisen in the interim, and because of a lack of progress in the Kensington matter. Shortly thereafter, Levitan mailed the Kensington certificate of incorporation and corporate kit to Myers. At such time no shares of Kensington stock had been issued and Kensington had not engaged in any business activity.

Allen Yeh (Yeh) was employed as Kensington's vice president and general manager from November 3, 1980, through March of 1983. At the time Yeh was hired by Kensington, he had approximately 4 years' experience as an accountant, but had no previous experience in banking or finance. Yeh was interviewed for the position by Myers, and he initially reported to work at Myers' residence. Subsequently, Yeh reported to work at AMINTCO's offices, and eventually to an office leased through Myers' efforts on behalf of Kensington.

Shortly after Yeh was hired by Kensington, Levitan sent a letter, at Myers' request, to Kensington's registered agent naming Yeh as his successor.

Myers explained to Yeh that Kensington was a subsidiary of Erylmore Co., Ltd. (Erylmore), a Hong Kong finance company which would fund the promissory notes of the gold

---

[11]The parties have stipulated, in what is probably a typographical error, that Kensington was formed May 16, 1980. The parties have also stipulated, as a joint exhibit, a copy of the certificate of incorporation, dated May 19, 1980.

program's investors. Myers also explained that he (Myers) would act as agent of Erylmore in the United States. Yeh was supervised by Myers during the entire course of his employment at Kensington. With the exception of a secretary and some temporary clerical workers, Yeh neither met nor had knowledge of any other Kensington employees. He also has never had any contact with any director, officer, or other employee of Erylmore.

At the commencement of his employment, Yeh was given signatory authority (shared by Myers) over Kensington's checking account at the Sumotomo Bank of California, which at that time had a balance of approximately $100,000. By early December 1980, Kensington ceased transacting business at the Sumotomo Bank, eventually closing its account there during 1981. Kensington opened two checking accounts toward the end of 1980—one at Interstate Bank (used as a petty cash account) and another at TransWorld Bank (used to fund investors' promissory notes). Yeh and Myers both had signatory authority with respect to the account at Interstate Bank. The record is inconclusive, however, as to signatory authority over the account at TransWorld Bank.

*Processing the Loans*

Erylmore was formed April 23, 1980, under Hong Kong law. The ownership of Erylmore is not ascertainable on this record.

Lynn Pooler (Pooler) was employed as AMINTCO's bookkeeper from November 1980 through May 1982. While employed at AMINTCO, Pooler carried out her duties under Myers' supervision. Her duties included establishing and maintaining books and records for both Omni and AMINTCO, and maintenance of checking accounts in Erylmore's name. Additionally, Pooler was responsible for the processing of investor "packets" as received by AMINTCO. Each packet included the documents[12] executed by the investor, the investor's check in the amount of $50 payable to Omni pursuant to the purchase agreement, and the investor's check to AMINTCO covering one-sixth of its mining develop-

---

[12]Investor packets included the executed mining agreement, the promissory note and security agreement, the purchase agreement, and the purchaser questionnaire.

ment fee. Since the mining agreement required a mining development fee of at least $30,000, the check payable to AMINTCO was always in an amount of $5,000 or more. These checks were deposited daily by Pooler into the appropriate checking accounts. Pooler would make and send copies of all documents in the packet to the investor, and a copy of the promissory note, the purchase agreement, and the mining agreement to Kensington. AMINTCO retained the originals of all such documents.[13]

Under Myers' direction, Pooler and Yeh coordinated their efforts to maintain a circular flow of AMINTCO's funds (received as the mining development fee) through Erylmore to Kensington, and then back to AMINTCO. The objective of this circular money flow was to give the appearance that Kensington had sufficient funds to fund investors' promissory notes. Erylmore would borrow these funds from AMINTCO, then loan them to Kensington. Kensington would then issue checks payable to AMINTCO, thereby giving the appearance that the investors' promissory notes were fully funded.[14] Each transfer of funds from AMINTCO to Kensington typically took 1 or 2 days. In connection with each transfer, Pooler would deposit into Erylmore's account a check drawn on AMINTCO's account, wait a day or two for the funds to clear, then prepare a check drawn on Erylmore's account for deposit into Kensington's account. (Checks drawn on AMINTCO's and Erylmore's accounts were signed by Myers). In order to avoid overdrafts in the Erylmore account, the Erylmore check was typically smaller in amount than the preceding AMINTCO check. Pooler usually delivered the Erylmore check to Yeh for deposit by him into Kensington's account. On other occasions, Pooler would make the deposit into Kensington's account, then notify Yeh of the deposit.

Pooler would periodically prepare a schedule of deposits summarizing transfers of funds from Erylmore to Kensington. Using such schedules, Yeh would prepare and sign on behalf of Kensington promissory notes payable to

---

[13]We base our finding that Kensington received only copies of such documents, including the notes, on the testimony of Pooler and Yeh who handled such documents.

[14]The terms "borrow," "fund," and "loan" are used merely for the sake of our convenience in describing the alleged transactions, and are not to be construed as a finding by us as to the substance of the transactions described.

Erylmore. To evidence each transfer of funds from AMINTCO to Erylmore, Pooler would prepare promissory notes (referred to as "commercial paper") payable to AMINTCO in the appropriate amounts. In connection with the gold program, Erylmore issued promissory notes payable to AMINTCO totaling in excess of $55 million. Such notes were signed on behalf of Erylmore by either Myers or Yeh.

Kensington, Erylmore, and AMINTCO entered into an agreement pursuant to which Erylmore was relieved of making payments of principal or interest with respect to the promissory notes it had executed in favor of AMINTCO, except to the extent that Erylmore received payments of principal and interest owed it by Kensington. In turn, Kensington was not required to make payments of principal or interest it owed Erylmore, except to the extent Kensington received payments of principal and interest from gold program investors on their promissory notes. This agreement between AMINTCO, Erylmore, and Kensington was described in AMINTCO's audited financial statements for the year ended March 31, 1981, as follows:

the ultimate realizability of notes receivable [from Erylmore] and of the accrued interest thereon is dependent on the repayment of notes to Kensington by program participants. Whether or when such repayment will occur cannot reasonably be estimated at present because of the uncertainty surrounding the amount of precious metal which will be recovered from the participants' mineral properties and the market value of such precious metal at the time it becomes available * * * . Since [AMINTCO] has no prior experience in [mine development] operations, the likelihood that the contracted revenues will equal or exceed the cost to perform the contracted services cannot reasonably be estimated at present.

Kensington made no attempt to investigate the credit of the investors before funding their respective promissory notes, although in each case Yeh would check Kensington's copy of the purchase agreement, the mining contract, and the promissory note for mathematical errors. Based upon the record, we find that virtually all moneys used by Kensington to fund the notes were provided by Erylmore which, in turn, received the funds it advanced to Kensington from AMINTCO. Except for small amounts of start-up capital, and rental and interest income, AMINTCO received all of its funds, which totaled $10,923,000, from

investors in the gold program. No principal or interest payments were ever made by petitioners on their promissory notes to Kensington. Sometime prior to March 1983, the respective notes were returned to petitioners.[15]

*The Mining Program*

The gold program herein was structured so that each investor would receive his own ore block measuring approximately 6 feet wide (corresponding to the claimed average width of the ore vein found on the Shamrock and Encino Vivo properties), 8 feet long, and 100 feet deep. Each investor was entitled only to the gold or silver contained in his own ore block. Each investor was assured that his ore block would be mined selectively and that his ore would not be commingled with that of other investors. Based upon our analysis of expert testimony presented at trial concerning possible mining methods, we find that selective mining of individual ore blocks of the size purportedly sold by Omni without the commingling of such ore is not possible using conventional mining practices.[16]

The Shamrock and Encino Vivo lode claims[17] were described at length in the prospectus and were purportedly the claims from which investors were to receive ore block

---

[15]An agreement between AMINTCO and Erylmore dated Apr. 26, 1982, provides, in pertinent part:

Whereas, it was the intent of ERYLMORE, KENSINGTON, and AMINTCO, that principal and interest balances on the commercial paper would be paid off by ERYLMORE only to the extent that Principals' notes were paid off to KENSINGTON, and not before they were paid off.

Therefore, for full and valuable consideration, receipt of which is hereby acknowledged, ERYLMORE AND AMINTCO HEREBY AGREE AS FOLLOWS:

    *   *   *   *   *   *   *

d. Should KENSINGTON return a note to any Principal(s) voluntarily as part of any settlement agreement, recision, or for any other reason, or should Principals' obligations to KENSINGTON otherwise for any purpose whatever (except for Principals' payment) be reduced, then the principal balance owed by ERYLMORE to AMINTCO shall thereupon be promptly reduced by an equal amount.

[16]Petitioners' expert Robert Mathis testified that the mining of individual ore blocks without commingling was possible, but it is clear from his testimony that he was basing his conclusion on the assumption that such blocks were 60 feet or more in length. We note that the purchase agreement provided for ore blocks approximately 8 feet in length.

[17]Mining location laws authorize two main types of claims—lode and placer—depending upon the character of the deposit. Lode claims are staked on veins or lodes of quartz or other rock in place bearing gold, silver, or other valuable deposits. A lode is frequently considered as a zone or belt of mineralized rock clearly separated from neighboring nonmineralized rock. Placer claims are staked on all forms of deposit, except veins of quartz, or other rock in place.

assignments. The Shamrock property consists of five unpatented lode mining claims known as Shamrock Nos. 1 through 4 and Jo Sheridan (collectively referred to as Shamrock). The Encino Vivo property consists of four unpatented lode claims, Encino Vivo Nos. 1 through 4, located several miles from the Shamrock property in the Burro Mountain mining district of Grant County, New Mexico.

Omni leased Shamrock from Louis L. Osmer, Jr. (Osmer), and his wife, Mary L. Osmer, on May 1, 1980. In a similar lease agreement, Omni leased the Encino Vivo property on May 14, 1980, from the Osmers, who owned a 50-percent interest in the property, and Osmer's partner, David Garcia, who owned the remaining 50-percent interest. Both leases granted the lessors overriding royalty interests in gold and silver extracted from the properties. Each lease granted Omni an option to purchase. The stated purchase prices, to be paid out of royalties, were $2 million for Encino Vivo and $5 million for Shamrock. A minimum royalty of $500 per month was payable with respect to Encino Vivo, whereas the Shamrock lease called for no minimum royalty payments. Omni was given the right to terminate either lease without cause upon 15 days' notice. The lessors could terminate the leases upon 60 days' notice of default, provided Omni did not cure the default within such time period.

The Shamrock property is described in the prospectus as having a 7,000-foot uninterrupted vein length, with vein thickness ranging from that of a "cigarette paper" to "four and five feet." The prospectus states that Shamrock has been mined intermittently since the early 1800's, with rich ore having been produced from various portions of the vein, *"but the ore shoots* were small and mining operations were short-lived." The ore vein is also described as discontinuous and fractured. The property is further described as having 15 openings with a combined total of 605 feet of vertical workings, but with no work having been done below 100 feet from the surface. The prospectus reveals that Osmer owns the property.

The prospectus also includes a statement authored by Osmer in which he claims that the most recent mining done

at Shamrock, from 1933 through 1939, resulted in total production in the amount of $60,000.

The Encino Vivo property was discovered in 1977 by Osmer and David Garcia. The prospectus reveals that Encino Vivo is held in David Garcia's name and that Osmer is his "silent partner." This property has no record of past production, but has been prospected in the past. The prospectus contains a brief description of the property, authored by Osmer, which states in part:

THE ENCINO VIVO VEIN SYSTEM CONTAINS SEVERAL 6″ AND 8″ VEINS, AND ONE MAIN STRUCTURE AVERAGING TWO FEET IN WIDTH. DURING THE LATE TWENTIES, A COUPLE OF OLD PROSPECTORS (KNOWN IN LATER YEARS TO THE WRITER) SANK TWO SHALLOW HOLES ON THE MAIN STRUCTURE, BUT COULDN'T SUSTAIN THEIR ACTIVITIES LONG ENOUGH TO DO ANY GOOD. DURING LATER TIMES THE WRITER ADVISED THE PRESENT CLAIM HOLDER TO PROSPECT THE AREA, WHICH HE DID, FINDING VISIBLE GOLD. ONE SAMPLE, SELECTED BY A PRACTICING GEOLOGIST, CARRIED 5.5 OZ AU., AND 16 OZ. AG. THE GROUND WAS SUBSEQUENTLY STAKED AND PROVEN UP ON.

In another part of the prospectus, Osmer writes of the Encino Vivo property:

AT THE PRESENT, ORE RESERVES ARE NOT BLOCKED. THEREFOR[E], RESERVES CAN ONLY BE ESTIMATED, NOT MEASURED. POSSIBLE RESERVES COULD BE ONE HALF MILLION TONS WITH AN AVERAGE TENOR OF 1/2 OZ. AU.

Included in the prospectus was a report by Dr. Ralph E. Pray (Pray), a consulting engineer and metallurgist who, during 1980, operated a commercial assay laboratory located in Pasadena, California. Pray had visited neither the Shamrock nor the Encino Vivo property before preparing the report. The report consists of a 1½ page geological summary of the Burro Mountain mining district accompanied by assay results of 11 rock samples allegedly taken from Shamrock and 4 rock samples allegedly taken from Encino Vivo. Osmer purportedly took such samples at 750-foot intervals along the veins of the Shamrock and Encino Vivo properties, then shipped the samples he had taken to Pray's laboratory in Pasadena. It is apparent from

the prospectus that Osmer took the samples analyzed by Pray in his report.[18]

The report showed sample results ranging from a "trace" of gold to 2.10 ounces of gold per ton, with most of the samples revealing less than .5 of an ounce of gold per ton. The samples also showed silver content ranging from "nil" to 3.3 ounces per ton.[19]

Pray's geologic report concluded with the following paragraph:

The underground potential of the Shamrock group may be investigated through a sampling of the quartz vein in which values occur. The possibility of surface, or open pit, mining is extremely remote. A partial clean-out of the numerous shafts, open stopes, trenches and pits would be necessary prior to entrance for examination.

Potential investors also received the following explanation in the prospectus regarding the reasons no underground sampling, such as a core drilling program, was undertaken:[20]

Surface samples of gold/silver properties tend to give consistently *lower* results than below-the-surface samples. This occurs for two basic reasons. First, *millions of years* of weathering and water tend to dissolve gold and silver, and "leach" them from surface rocks to lower levels. Silver is particularly soluble, over *long* periods of time, and may migrate fifty or more feet downward in an ore body. Secondly, since both ore bodies have been known, prospected, and occasionally mined over the last one hundred years, attractive ore shoots and veins reaching the *surface* have already been mined. What remains on the *surface*, therefore, would not be expected to show high values, since it has been picked nearly clean. It has, however, shown *very high* production values in the past.

One might ask why sub-surface samples were not taken. Sub-surface sampling of an extensive nature is *very costly*, and was felt to be unnecessary and a waste of money. * * *

[18]The prospectus received by petitioner Patin did not disclose the fact that Osmer had taken the ore samples upon which Pray based his report.

[19]Petitioner Patin received assay reports showing only composite results regarding the two properties as follows:

|  | Gold (oz/ton) | Silver (oz/ton) |
|---|---|---|
| Shamrock | 0.36 | 0.2 |
| Encino Vivo | 0.28 | 3.2 |

[20]The prospectus received by petitioner Patin did not include a copy of the documents in which the quoted excerpt appears.

Included with the prospectus was a title opinion authored by J. Wayne Woodbury, a Silver City, New Mexico, attorney, regarding the Shamrock and Encino Vivo properties.[21] The title opinion states, in part:

In order to verify that these are good unpatented lode mining claims, it is necessary that a field inspection be made on the ground to determine that the claims are properly staked, that a valid discovery was made, that there are no overlapping or conflicting mining claims and that the annual labor required by the laws of the United States and the State of New Mexico have been performed. It is my understanding that this has been done, however, I did not make a field inspection of the property and cannot address myself to this.

On or about July 10, 1980, Omni hired a geologist named Robert W. Mathis (Mathis) to make a geologic report on the Shamrock property. At that time, Mathis verbally expressed to Parrish his opinion that, based upon surface observations and the sparse sampling done up to that point in time (the Pray assays), it was impossible to conclude that the Shamrock property had any economic potential. Mathis subsequently submitted a written report to Omni dated October 27, 1980, in which he recommended that extensive sampling be undertaken in order to determine whether a core drilling program was warranted and, if so, the extent and direction of such a program.

During September of 1980, AMINTCO hired Western Testing Laboratories (Western Testing), a commercial assayer and geologic consulting company, to prepare a geologic report and take assay samples from the Shamrock and Encino Vivo properties. Additionally, Western Testing was expected to map the Shamrock claims. Pursuant to this request, Western Testing submitted a geologic report, assay results, and a map to AMINTCO on or about October 3, 1980, for which it was paid $4,500. Assay results are summarized in the report as follows:

Gold and silver contents of Samples R-1 through R-43 were determined by the conventional fire-assay fusion method. Twenty-five of the samples ran only a trace or nil on gold, whereas only eight samples ran nil on silver. The remaining samples ran from 0.001 to 0.091 ounces of gold per ton of ore, and from 0.02 to 0.71 ounces of silver per ton of ore. * * *

---

[21]The prospectus received by petitioner Patin did not include a copy of this title opinion.

In the report, Billy Mack Clem (Clem), owner of Western Testing, concluded that the surfaces of the properties showed no signs of enriched mineral content at depth (such as by downward leaching of minerals) and recommended that no further work be done at Shamrock and Encino Vivo.

Despite receiving these unfavorable geological reports, AMINTCO hired Osmer during October 1980 to take complete charge of selecting mining equipment for acquisition and hiring of employees as he deemed necessary. Prior to hiring Osmer, AMINTCO had no mining or milling equipment.

In October of 1980, AMINTCO acquired an old brick yard south of Silver City which was to be used for storage and repair of mining equipment. From the latter part of 1980 through March of 1981, Osmer acquired approximately $2 million worth of mining and milling equipment, hired employees, and applied to various governmental agencies for permits needed to commence mining. In January 1981 AMINTCO named Osmer as its vice president for field operations.

In either January or February of 1981, AMINTCO hired Dr. A.F. Frederickson (Frederickson), a geological consultant, to evaluate the commercial potential of the Shamrock and Encino Vivo properties. After analyzing assay results from samples he had taken on the Shamrock property, Frederickson reported to Omni sometime in March 1981 that the Shamrock claim showed little commercial potential. In addition to Shamrock, Frederickson evaluated the Encino Vivo property and a number of other mineral properties which Omni had leased between September 1980 and February 1981, concluding that none of these properties exhibited commercial potential.

Omni decided on or about March 31, 1981, to abandon the Shamrock and Encino Vivo claims. Early in April 1981, AMINTCO dismissed Osmer and 39 of its 64 employees at the Silver City location. At this point in time, AMINTCO had not yet done any work on the Shamrock and Encino Vivo properties, with the exception of having staked possible core drilling sites.

Omni then hired Frederickson to search for substitute mineral properties. Frederickson found a mineral property

located in southern Colorado known as the Mary Murphy mine. Omni leased the property, commencing in July 1981. The lease required an initial payment of $100,000 plus monthly lease payments of $8,333.33. Omni paid Frederickson a $100,000 finder's fee in connection with this transaction.

The Mary Murphy mine had been mined from the 1870's through 1949, but it was impossible to determine in 1981 from then existing records the extent or quality of any remaining ore shoots. Frederickson recommended that AMINTCO clean up the access roads and old tunnels in the Mary Murphy mine so that core drilling could be performed to determine whether the mine had remaining commercial potential.

From July 1981 through January 1982, AMINTCO cleared roads, excavated cave-ins and re-timbered tunnels at the Mary Murphy mine. Work was slowed somewhat with the onset of winter and its accompanying cold temperatures and heavy snowfall. In November 1981, consulting geologists were hired to determine core drilling target areas. On January 18, 1982, AMINTCO began operating a core drill within one area of the mine. AMINTCO also started taking bulk samples (apparently weighing several hundred tons). Such samples showed disappointing results. AMINTCO ceased operations at the Mary Murphy mine early in February 1982. During March of that year, AMINTCO moved its equipment from the Mary Murphy mine to storage in Silver City, New Mexico. By May 1982, AMINTCO had sold or was in the process of selling all of its mining equipment and fixed assets, and had terminated all but four of its employees. AMINTCO thereafter engaged in no further mining activities at the Mary Murphy mine or at any other site, with the exception of reclamation work at the Mary Murphy mine as required under Colorado law. Subsequent to leasing the Mary Murphy mine, Omni continued with the assistance of Frederickson in its efforts to locate other mineral properties. Omni staked placer claims in Nevada based upon Frederickson's work, but such claims became subject to dispute with conflicting claimholders.

For the year ended March 31, 1981, Omni borrowed more than $850,000 from AMINTCO. Such funds were used in

large part to pay Omni's operating expenses. Omni's only other sources of cash during such year were as follows:

| Source | Amount |
|---|---|
| Paid-in capital | $1,000 |
| Sales to gold program investors | [22]56,800 |
| | 57,800 |

During 1981 and 1982, AMINTCO occasionally informed investors, through "Principals' Newsletter(s)," of the progress and setbacks experienced by the 1980 gold program. Petitioners received a total of eight Principals' Newsletters, as follows:

| Number | Dated |
|---|---|
| 1 | Jan. 30, 1981 |
| 2 | May 8, 1981 |
| 3 | June 30, 1981 |
| 4 | Oct. 6, 1981 |
| 5 | Dec. 14, 1981 |
| 6 | Apr. 9, 1982 |
| 7 | Nov. 20, 1982 |
| 8 | Feb. 2, 1983 |

Investors were informed in Principals' Newsletter No. 2 that the Shamrock and Encino Vivo properties were to be abandoned and that Omni was searching for substitute properties. In this context the newsletter also stated, "Naturally, we are being extremely careful to not jeopardize the tax advantaged aspects of the program."

Principals' Newsletter No. 3 informed investors of Omni's acquisition of the Mary Murphy mine. This newsletter also informed investors that ore block assignments would eventually be made to them from the Mary Murphy mine or from other Omni properties instead of Shamrock and Encino Vivo, "Unless we hear to the contrary from you." None of petitioners opted out of the gold program at this point in time.

In Principals' Newsletter No. 5, investors were told that "mining" had commenced at Mary Murphy, but that it was limited to the taking of bulk samples for purposes of testing and analysis. The newsletter disclosed that some of the investors had been audited by the Internal Revenue Service

---

[22]Omni received $50 from each of the 1,135 gold program investors pursuant to their respective purchase agreements. Although 1,135 × $50 = $56,750, the record reflects total sales income of $56,800, resulting in an unexplained discrepancy of $50.

and that their deductions based upon the gold program had been disallowed. In this context, the newsletter stated, "We have been told that performance is the best possible thing that we can do to sustain the deduction claimed for the program." Investors were also informed that Omni and AMINTCO had retained tax counsel for the purpose of litigating a test case in this Court.

Principals' Newsletter No. 6 disclosed that the Mary Murphy mine had been shut down in January 1982 for the duration of the winter. The newsletter also informed investors that Omni had staked placer claims in Nevada and that the rights to such claims were the subject of litigation then recently filed by Omni.

Principals' Newsletter No. 7 disclosed that AMINTCO's operations at Mary Murphy had not been resumed in the spring of 1982 and that the property had been abandoned by Omni. Investors were also informed that AMINTCO would return to them their Kensington promissory notes immediately if they executed a "Termination Agreement"[23] or, in any event, by January 1983.

*Michael W. Patin*

During the year in issue, petitioner was employed as a stock broker. Late in October 1980, petitioner learned of the gold program and was given a copy of its prospectus by Sam Jones (Jones), a coworker's client. Jones was employed at the time as a business analyst for the Martin Cohn family. Shortly thereafter, petitioner was introduced to Jones' business associate, Bart Munro (Munro), who was involved in marketing the gold program. Neither Jones nor Munro had any experience or expertise in gold or silver mining. During the ensuing weeks petitioner had numerous conversations concerning the gold program with both Jones and Munro. Jones and Munro had each visited the Shamrock and Encino Vivo lode claims and had spoken with Myers, Parrish and Osmer about the program. Both men had checked references given by Myers, and Munro had verified some of Parrish's references. Although Munro had taken seven or eight rocks from the Shamrock property and

---

[23]This "Termination Agreement" is not in evidence.

had two of them assayed, the sample used was too small to be of any value.

Prior to investing in the gold program, petitioner performed rough calculations of his potential profit from the gold program, using assumptions contained in the prospectus with respect to the grade of ore at Shamrock and Encino Vivo, and approximate market prices for gold ($500 per ounce) and silver ($15 to $19 per ounce).

Petitioner executed the necessary contracts with Omni and AMINTCO on November 21, 1980. The purchase agreement which petitioner signed called for the sale to petitioner of 1,800 tons of ore for $50, which petitioner paid by check, plus a 50-percent overriding royalty in favor of Omni. The agreement contained no description of the claim or claims from which such ore was to be designated and eventually extracted.

Pursuant to the mining agreement which petitioner executed, petitioner paid AMINTCO $15,000 by check and executed a $75,000 promissory note in favor of Kensington. This $90,000 total contract amount was derived by multiplying a $50 per ton "development" fee times 1,800 tons. Such agreement contained three provisions not found in the typical mining agreement as executed by other investors in the program. (These provisions had been drafted by an attorney on behalf of Jones' employer and shared with petitioner by Jones). One of these provisions required AMINTCO to maintain liability insurance coverage with respect to its mining operations at Shamrock and Encino Vivo. Petitioner did not seek proof of insurance coverage from AMINTCO prior to executing the mining agreement, nor did he ever receive such proof. However, sometime during December 1980, Jones informed petitioner that Munro had seen an insurance policy obtained by AMINTCO. On Schedule C of his 1980 joint Federal income tax return petitioner deducted $90,000 of "mining expense."

After executing such contracts, petitioner remained in contact with Jones who, on behalf of his employer, called AMINTCO in Silver City intermittently in order to inquire about progress at the Shamrock and Encino Vivo properties. Petitioner also maintained files in his home wherein he included correspondence from AMINTCO, Omni, and

Kensington. Included in his files, was a copy of Kensington's canceled check to AMINTCO with which it had allegedly funded his loan. Also included in petitioner's files were copies of the Principals' Newsletters. On November 17, 1981, petitioner attended a meeting conducted by Myers in Houston concerning, among other things, AMINTCO's activities at the Mary Murphy mine.

The promissory note which petitioner had executed in favor of Kensington was canceled and returned to him sometime late in 1982 or early in 1983.

*Arthur Espy*

During the year in issue, Arthur Espy (Espy) was a self-employed sales consultant. One aspect of his work was the production of audiovisual sales training films. Prior to his involvement with marketing the 1980 Omni gold program, Espy had approximately 20 years of experience selling, among other things, securities, commodities, and military hardware.

Espy was introduced to the gold program in late summer or early fall of 1980 and immediately became interested in selling the program to prospective investors. On or about October 22, 1980, he traveled to Silver City, New Mexico, where he met Parrish and Osmer. While there, Espy produced a promotional film featuring views of the Shamrock and Encino Vivo claims, and descriptive narration by Parrish and Osmer. Espy utilized this film in his efforts to market the gold program.

Prior to commencing his gold program sales activities, Espy called Myers' personal references, called the New Mexico Bureau of Mines, and read some materials concerning the history of gold mining in Grant County, New Mexico, where Shamrock and Encino Vivo are located. Espy also did some general reading at the Southern Methodist University library on the subject of gold mining. Additionally, Espy telephoned a mining consulting firm to inquire about what steps were necessary to verify Omni's claims with respect to ore reserves at Shamrock and Encino Vivo. Espy learned that such verification would initially require several days' work by a geologist and two assistants taking numerous assay samples and conducting other investiga-

tions, and would cost between \$10,000 and \$25,000. Espy elected not to pursue verification of Omni's claims.

Espy commenced selling the gold program sometime in November 1980. AMINTCO agreed to pay him a commission in an amount equal to 15 percent of the cash raised through his efforts. Additionally, AMINTCO was to pay a gold bullion bonus, payable in installments, starting in 1981.[24] Espy employed a sales staff to assist him in marketing the gold program. Espy's sales efforts brought in more than \$1.7 million of investors' cash and resulted in over \$260,000 in commission income to him.

On or about December 30, 1980, Espy executed the agreements with Omni, AMINTCO, and Kensington which form the basis of the dispute herein. The purchase agreement, the mining agreement, and the promissory note and security agreement, which Espy executed are the same in all material respects as those executed by the other petitioners. Pursuant to the purchase agreement, Espy was to be designated ore blocks weighing 1,440 tons. In return, Espy granted Omni a 50-percent overriding royalty and paid a total of \$50 to Omni upon execution of the purchase agreement. The mining agreement called for AMINTCO to develop such ore at a cost of \$50 per ton, resulting in a total "mining development" fee of \$72,000, in satisfaction of which Espy paid AMINTCO \$12,000 at closing and executed a promissory note in favor of Kensington for the remaining \$60,000. On Schedule C of his 1980 Federal income tax return, petitioner Espy deducted \$72,000 of "mine development" expenses. On the same Schedule C, petitioner Espy also reported commission income and expenses from his sales of gold program interests.

Espy kept files concerning his investment in the Omni gold program, including a copy of Myers' resume, the Principals' Newsletter(s) which AMINTCO sent him during 1981 and 1982, and a copy of the check with which Kensington allegedly funded his promissory note. He followed gold and silver prices regularly on network television

---

[24]It appears that Espy was owed more than 3,000 ounces of gold bullion bonuses under his agreement with AMINTCO. Although in 1982 he made written demand that the bonuses be paid to him, he decided shortly thereafter not to pursue the matter further, and apparently has not received any such amounts. Espy testified that he decided not to pursue his claimed bonuses in order to remain on good terms with Myers.

news programs. During 1981 and 1982, Espy made phone contact with AMINTCO approximately once every other month.

The promissory note and security agreement which Espy had executed in favor of Kensington was canceled and returned to him sometime late in 1982 or early in 1983.

*Gordon Hatheway*

Petitioner Gordon Hatheway (Hatheway) has been engaged in the private practice of law since 1973.

Hatheway was introduced to the Omni gold program in August or September of 1980 and was given a copy of its prospectus by his "financial analyst," Ron Goldberg. Mr. Goldberg, in turn, had received the prospectus from a Roger Lindsay at a financial analysts' convention.

Prior to investing in the gold program, Hatheway made a number of phone calls, primarily to people whose names appeared in the prospectus, to check on the reputations of Myers, Parrish, Osmer, AMINTCO, and Omni. He spoke with J. Wayne Woodbury, the attorney who had written the title opinion included in the prospectus, and with an attorney from the firm which had rendered the tax opinion accompanying the prospectus. Hatheway also spoke at length with Mr. Lindsay, who he understood had visited the Shamrock and Encino Vivo lode claims, concerning Lindsay's impressions of the program and the reputations of the people and companies involved. Finally, Hatheway testified that since late 1979, he had been involved through his legal practice in litigation concerning a gold and silver mine and had thus acquired some familiarity with mining terminology and had become acquainted with certain individuals who he considered to be "mining experts." In casual conversations with these "mining experts" Hatheway described the gold program to them in general terms and asked for their general impressions concerning the program. Hatheway also asked such individuals whether they had heard anything negative concerning the promoters or the companies involved in the gold program. Hatheway also, apparently by mental approximations, concluded that an investment in the gold program would return a profit even if the amount of gold recovery per ton of ore were only 50 percent of the amounts claimed

in the prospectus, or if the price of gold were to decline to approximately 50 percent of the then current market price.

Hatheway entered into the contracts with Omni, AMINTCO, and Kensington on or about December 19, 1980. The purchase agreement called for the sale of 600 tons of ore to Hatheway for $50 and a 50-percent overriding royalty interest in favor of Omni. AMINTCO was to develop such ore under the mining and security agreement for a total "mining development" fee of $30,000 (a charge of $50 per ton), in satisfaction of which Hatheway paid $5,000 at closing and executed a promissory note in favor of Kensington for the remaining $25,000. The agreements which Hatheway executed are in all material respects the same as those executed by the other petitioners. On Schedule C of his 1980 joint Federal income tax return, Hatheway deducted $30,000 of "mining development expenses."

Hatheway kept files concerning the gold program, including a copy of the prospectus, a copy of the check with which Kensington allegedly funded his promissory note, the agreements which he executed, and the Principals' Newsletter(s). During the first six months of 1981 he spoke several times with Mr. Lindsay concerning the progress of the program. He also kept abreast of gold and silver prices.

The promissory note which Hatheway had executed in favor of Kensington was returned to him no later than March of 1983.

## Edward Gomberg

Since 1971 petitioner Edward Gomberg (Gomberg) has owned and managed Synair Corp., a very profitable manufacturer of urethane systems. During the year in issue, he had personally accumulated substantial sums of cash which he was seeking to invest.

Gomberg was introduced sometime in 1980 to Wilfred E. Duvall, an investment advisor to one of Gomberg's close business associates. Mr. Duvall informed Gomberg of the gold program and supplied him with a copy of the prospectus. Gomberg gave a copy of these materials to his attorney and a copy to an accountant who he believed had experience in accounting for mining companies. There is no

reliable evidence in the record indicating the scope of inquiry by Gomberg's attorney and the accountant into the gold program, or the exact nature of the advice they gave to Gomberg. Prior to investing in the gold program, Gomberg read the prospectus and discussed it with Mr. Duvall. Gomberg also performed a "best case/worst case" analysis of the venture's profit potential. Assuming the accuracy of Omni's projection that the ore sold contained a half ounce of gold per ton, he calculated his "break-even point" at a market price for gold of $233 per ounce, even without any silver content in such ore. In the "best case" computation, he calculated his profit potential at $1.3 million in the event gold were to sell for $2,000 per ounce and assuming the accuracy of Omni's projections as to the gold content of the ore.

On or about September 12, 1980, Gomberg executed the contracts with Omni, AMINTCO, and Kensington. Under the Purchase agreement, Omni was to sell to Gomberg 2,400 tons of ore for $50 and a 50-percent overriding royalty. Gomberg executed a mining and security agreement with AMINTCO requiring him to pay a $120,000 (at a rate of $50 per ton) "mining development" fee. He paid $20,000 of such amount at closing and executed a $100,000 promissory note in favor of Kensington in satisfaction of the remaining amount. Such agreements are in all material respects the same as those executed by other petitioners. In addition to the aforementioned agreements, Gomberg executed documents entitled "Special Gold Bonus Offer" and "Special Gold Bonus-Mining Agreement."[25] Under the agreement styled "Special Gold Bonus Offer," Omni provided Gomberg with a 10-percent (240 ton) ore bonus subject to Omni's 50-percent overriding royalty.[26] Under the "Special Gold Bonus-Mining Agreement" Gomberg was required to

[25]The parties have stipulated to copies of various documents pertaining to petitioner Gomberg, including copies of the documents entitled "Purchase Agreement," "Mining and Security Agreement," "Special Gold Bonus Offer," and "Special Gold Bonus-Mining Agreement." Although these four documents bear the signature of petitioner Gomberg, none shows any evidence of having been executed by the other party, to wit, Omni or AMINTCO. With respect to the "Mining and Security Agreement," the line designated as being for acceptance by Kensington is also blank.

[26]Ten percent "bonuses" were apparently offered to those investors who invested in the program prior to Sept. 30, 1980; 25-percent "bonuses" were offered to those who invested before Aug. 1, 1980.

pay AMINTCO $50 per ton for development and $5 per ton for extraction of the bonus tonnage, but payment of the fees for development, and then for extraction, was required only as AMINTCO completed such services with respect to the bonus ore.

On Schedule C of his 1980 joint Federal income tax return, Gomberg deducted $120,000 of mining development expenses. Pursuant to a preprinted schedule attached to his return, Gomberg allocated the $50 per ton development fee to 5 major categories of expense and, within such major categories, to 29 subcategories of expense. The schedule contained blanks filled in with Gomberg's name, address, total mining income for 1980 (in this case equaling zero), number of tons (2,400) of ore to which the $50 development fee applies, and total deduction for mining development expenses (in Gomberg's case the product of 50 × 2,400, equaling $120,000).

Gomberg maintained files concerning his investment in the gold program, including the prospectus, copies of the agreements he had executed, a copy of the check with which Kensington had allegedly funded his promissory note, and the Principals Newsletter(s) sent to him by AMINTCO. He attended an investors' meeting, held late in 1981, conducted by Myers. The promissory note which he had executed in favor of Kensington was returned to him no later than January 1983.

*William Skeen*

During the year in issue, William Skeen (Skeen) was employed as Vice President of Human Resources and Administration by Smith International, a large manufacturer of petroleum and mining drilling equipment. Skeen was introduced to the gold program by his investment advisor, Leland Wurtz (Wurtz, phonetically spelled), sometime in mid-November 1980. At Mr. Wurtz' invitation, Skeen attended a meeting sometime in late November at which Myers and Parrish promoted the program. Skeen received a copy of the prospectus at such meeting. Among others present at the meeting were two of Skeen's co-workers, also officers at Smith International. During the meeting, Skeen scribbled a rough calculation of the profit

potential of the gold program. Such calculation, however, is not in evidence.

Sometime shortly after attending this meeting, Skeen had one or more discussions with Mr. Wurtz, who he understood had personally met with Myers and Parrish. He also spoke with his two co-workers (both of whom Skeen believed had mining backgrounds) concerning their impressions of the gold program.

On or about December 5, 1980, Skeen executed the agreements with Omni, AMINTCO, and Kensington. The purchase agreement, mining agreement, and promissory note and security agreement which Skeen executed are in all material respects the same as those executed by other petitioners. The purchase agreement called for the sale by Omni to Skeen of 600 tons of ore for $50 and a 50-percent overriding-royalty interest. Under the mining agreement AMINTCO was to develop such ore at a cost of $50 per ton, resulting in a total "mining development" fee of $30,000. Skeen paid AMINTCO $5,000 at closing, and executed a promissory note in favor of Kensington for the remaining $25,000.

On Schedule C of their 1980 joint Federal income tax return, petitioners Skeen reported a $30,000 net loss for mining and development activity using the following breakdown:[27]

|  |  |
|---|---|
| a. Mine site preparation.......................... | $9,900 |
| b. Processing plant preparation................... | 12,000 |
| c. Transportation system development............ | 3,000 |
| d. Control systems............................... | 1,500 |
| e. General and administrative/ miscellaneous expenses...................................... | 3,600 |
| Total deduction ...................... | 30,000 |

Skeen maintained records concerning his investment in the program, including the prospectus, a copy of each document which he had executed, a copy of the checks he had written to Omni and AMINTCO, a copy of Kensington's $25,000 check to AMINTCO, with which Kensington had allegedly funded his promissory note, and Principals' News-

---

[27]Petitioner Skeen, upon cross-examination by respondent's counsel, had no recollection as to how the numbers with respect to these five categories of expenses were determined. He recalled, however, that he was advised by Mr. Wurtz that the five categories were "safe" categories to use on his income tax return.

letter(s) which he had received from AMINTCO. He followed gold and silver prices through reading newspapers. During 1981 and 1982, Skeen occasionally discussed his investments, including his investment in the gold program, with Mr. Wurtz. At some point during 1981, Skeen telephoned Myers and discussed with him the reasons for Omni's abandonment of the Shamrock and Encino Vivo properties and for its change to the Mary Murphy mine.

The promissory note which Skeen had executed in favor of Kensington was canceled and returned to him no later than January 1983.

## OPINION

The principal issue in these cases is the deductibility of petitioners' payments to AMINTCO as mining development expenses under section 616 or, in the alternative, as mining exploration expenses under section 617. Respondent's primary position is that the disputed expenditures were part of a tax-avoidance scheme lacking in economic substance and that the entire transaction should, therefore, be disregarded for Federal income tax purposes. Petitioners assert that the transactions represent a bona fide attempt to make a profit, had economic substance, and should therefore be respected for tax purposes.

It is well established that a transaction entered into solely for favorable tax consequences, having no commercial, legal, or profit objective will not be given effect for Federal income tax purposes. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978); *Knetsch v. United States*, 364 U.S. 361, 366 (1960); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); *Beck v. Commissioner*, 85 T.C. 557, 569 (1985); *Thomas v. Commissioner*, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986). In essence, it is the substance of the transaction, not its form, that determines its tax consequences. *James v. Commissioner*, 87 T.C. 905, 918 (1986), and cases cited therein.

In transactions where tax motivation is apparent, it is necessary to determine whether sufficient business purpose existed for the taxpayer to obtain the claimed benefits. *Rose v. Commissioner*, 88 T.C. 386, 412-413 (1987). We

found at page 412 of the *Rose* case, a Court-reviewed opinion, that tax motivation is apparent in activities having objective characteristics such as:

(1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * *

Accordingly, whether or not petitioners are entitled to the deductions claimed for mining development or exploration expenses is dependent upon the Court's finding that their mining activities constituted a trade or business or were undertaken and carried on for the production of income. *Rose v. Commissioner, supra* at 406; *Beck v. Commissioner, supra* at 569.

In the instant cases, tax motivation is apparent since tax benefits were highlighted in the gold program's promotional materials and newsletters; petitioners did not negotiate the purchase price or the mining development fees; the mining properties were overvalued and investors failed to receive any clear evidence of title or ownership; the mining properties were acquired by Omni shortly before the transactions in question for negligible amounts; and the bulk of the consideration was deferred by valueless promissory notes.

Based on the entire record it is abundantly clear that sufficient business activity did not exist which would support an objective finding that the transactions herein had a business purpose. *Rose v. Commissioner, supra* at 412.

*Petitioners' Pre-Acquisition Activities*

In searching for business purpose, we must examine the objective facts surrounding petitioners' activity in light of their claim to have been engaged in a profit-seeking endeavor. In the *Rice's Toyota World* case we examined a purchase-leaseback of computer equipment where residual value was critical to an economic profit. We found, however, that Mr. Rice failed to evaluate the transaction on that basis and, despite his lack of knowledge about computers,

chose to rely "upon the representations of the deal's promoter, of a friend, and the 'gut' feeling that it was a good deal." 81 T.C. at 202. Mr. Rice made no attempt to determine whether Rice's Toyota was purchasing an obsolete computer or one with potentially high residual value. We concluded that there was little reason, apart from the significant tax benefits, which could explain the entry of Rice's Toyota into the purchase-leaseback and, therefore, held that there was no valid business purpose underlying the transaction.

In the instant cases, petitioners claim to have been motivated by the tremendous profit potential which the gold program appeared to offer. Petitioners each contend that their pre-investment investigation into the profit potential of the gold program equaled or exceeded the level of investigation which they would normally have conducted prior to placing time or money into an activity in which they had no previous experience. Respondent argues that petitioners' actions merely reflect concern with establishing a plausible pretext for tax benefits, rather than evidencing bona fide attempts by them at a profit-seeking activity. Based on the record before us, we agree with respondent.

The record demonstrates petitioners' complete indifference to the gold program's chances for economic success. We note that none of petitioners had any experience in gold or silver mining, nor were they actively involved in carrying out the program in which they invested. We, therefore, find significant the fact that petitioners chose to rely exclusively on the promoters' representations concerning the quantity and quality of ore reserves at Shamrock and Encino Vivo. Such reliance is remarkable in light of the fact (easily gleaned from the prospectus) that Omni's representations were based upon sparse surface sampling performed by Osmer, the owner of the mining properties. Yet petitioners did not attempt to verify such reserve estimates through qualified independent sources.[28] Nor did any of petitioners,

---

[28]Petitioner Patin claims to have relied in part upon the assay results of two rocks picked up by Munro at Shamrock. We note that Munro is trained as an accountant, having no expertise in geology or mining. Patin testified that he was impressed that the samples taken by Munro contained any gold and silver whatsoever and that he thus regarded such samples as confirmation of Omni's claims with respect to ore values at Shamrock. We find petitioner's testimony in this respect implausible. We simply do not believe that petitioner, a trained stockbroker, would evaluate an obviously risky venture based upon such scant information

with the exception of petitioner Espy, even seek information concerning the nature and extent of geologic testing necessary to establish the presence of ore reserves or even to verify the promoters' claims with respect to reserves at Shamrock and Encino Vivo. Petitioner Espy, upon learning that extensive sampling and other work was necessary in order to verify Omni's claims, chose not to pursue the matter further.

The record shows that in establishing the existence of gold or silver ore reserves, standard mining industry practice involves, among other tests and observations, surface sampling at intervals of 15 to 50 feet and, if such samples show promise, subsurface sampling. By contrast, Omni's claims as clearly set forth in the prospectus were based upon surface samples allegedly taken at 750 foot intervals at Shamrock and Encino Vivo by the owner of such properties. Petitioners' claimed reliance on this "evidence" of rich ore reserves simply does not ring true. Moreover, we note that Omni's claims as set forth in the prospectus are nothing short of fantastic in light of testimony by both respondent's and petitioners' experts that such claims, if true, would have meant that Shamrock and Encino Vivo were among the richest unmined deposits of gold then known to exist.

Petitioners are all sophisticated businessmen. We simply do not believe that they would enter into profit-motivated transactions with an unknown party and rely solely on the representations of such party with respect to the most crucial aspect affecting the viability of the proposed venture. Only the promised six-to-one tax deduction can adequately explain petitioners' entry into the gold program under such circumstances. See *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 202.

*Petitioners' Acquisition Activities*

Each petitioner asserts that at the time he entered into the gold program he was looking to the ore reserves of the

---

supplied by a person whom he had known for approximately 1 month and with whom he had no previous business dealings. Finally, we note that Munro was paid a commission with respect to petitioner's investment in the program. Although petitioner testified that he knew nothing of such commission, we have some trouble believing that petitioner actually thought that Munro's efforts were supplied gratis.

Shamrock and Encino Vivo properties and, more specifically, to his own ore blocks for a return on his investment. The record clearly contradicts such an assertion. The purchase agreements entered into by petitioners do not designate the ore blocks allegedly purchased by them, but merely provide that (at some unspecified point in time) Omni would randomly assign ore blocks to each investor. Equally as important is the fact that the purchase agreements do not name or describe the Shamrock or Encino Vivo properties as the mining claims from which ore blocks would eventually be designated.[29] Under the circumstances, petitioners' claimed belief in the extraordinary values of these two specific mineral properties clearly lacks credibility.

Petitioners' lack of concern about exactly what they purchased, if anything, is not unlike that of the taxpayer in *Moore v. Commissioner*, 85 T.C. 72 (1985). In *Moore*, the taxpayer, a lawyer, purportedly purchased an exclusive territorial franchise for $384,000 under an agreement which failed to pinpoint the location of the territory allegedly purchased. We stated at page 104 of the opinion:

> It staggers the imagination to believe that any careful lawyer like petitioner would even consider obligating himself to purchase an exclusive territorial franchise for $384,000 * * * when the location of the territory was not specified in the contract. * * * The location of the territory does not appear to have been of critical importance to petitioner, and the real explanation for this seemingly extraordinary situation is that this was no true, bona fide agreement to purchase an exclusive territorial franchise.

Like the taxpayer in *Moore*, petitioners are all sophisticated businessmen. We think our analysis in *Moore* applies with equal force to the alleged purchases by petitioners in the instant cases of unspecified ore blocks on unspecified mining properties.

---

[29]The parties have submitted arguments with respect to whether petitioners actually obtained title to anything pursuant to the purchase agreement under New Mexico law. We need not decide this issue. See e.g., *Sanchez v. Garcia*, 72 N.M. 406, 384 P.2d 681 (1963) (competence of extrinsic evidence to identify the land intended to be described in the deed); see generally 23 Am. Jur. 2d Deeds, secs. 296-320 (1983). It is sufficient for our purposes to note that the absence of a description in a document purporting to transfer title would usually cause concern in the mind of a would-be purchaser, a factor that petitioners all appeared to ignore in these cases.

We observe that the title opinion included with the prospectus did not address the effectiveness of the alleged transfers of ore blocks from Omni to gold program investors, but dealt only with the validity of the transfers to Omni from the Osmers and Garcia of their interests in Shamrock and Encino Vivo. Moreover, the title opinion clearly stated that it was based upon certain assumptions which could only be verified by "field inspection" and that its author, Woodbury, had not performed such an inspection prior to rendering his opinion. We also note that petitioner Patin's prospectus did not include Woodbury's title opinion and that, like the other petitioners, he did not obtain a title opinion with respect to Omni's alleged transfer to him. Finally, with respect to petitioner Gomberg, the evidence indicates that the purchase agreement was not executed by Omni or, at the very least, that he did not have a copy in his files of such agreement fully executed.

We also find unpersuasive petitioners' contention that they were influenced to enter into the disputed transactions by Omni's promise to mine, at no cost to petitioners, a second block of ore in the event the first block assigned to them failed to produce at least $220 worth of gold and silver per ton. In fact, petitioners' original ore blocks were never assigned and, consequently, were never mined. Hence, Omni's "guarantee" never came into play. Nor did petitioners seek to have Omni and AMINTCO meet their obligations under the agreements. Petitioners took no steps to ascertain whether Omni, a newly formed corporation, was financially capable of performing its "guarantee." The record shows that Omni's primary source of funds during the year in issue was loans from AMINTCO, and that petitioners had no idea when they entered into the disputed transactions whether or not Omni's "guarantee" had any value.

In sum, petitioners appeared completely indifferent to the success or failure of the venture, and such indifference cannot be explained away as reliance by them on Omni's "guarantee." Under the circumstances, we can find no reason why petitioners engaged in the disputed transactions other than to obtain promised significant tax benefits.

## Petitioners' Post-Acquisition Activities

Further evidence supporting the conclusion that petitioners had no business purpose for entering into the disputed transactions are the significant facts that petitioners made no attempt to determine whether AMINTCO was fulfilling the mining contract and took no action to save their respective investments in the program once the failure at the Shamrock and Encino Vivo properties became apparent. Petitioners' occasional inquiry into the activities of Omni and AMINTCO rose merely to the level of curiosity, and certainly did not reflect the level of concern which would normally attend a business activity and subsequent potential loss of a substantial investment. Also, petitioners were indifferent to the fact that they did not even receive an assignment of their promised "ore block" from Omni. "Where, as here, the promised tax benefits are suspiciously excessive and the transaction as a whole is entered into and carried out with a complete indifference to profit, it is clear what the parties intended to accomplish." *Flowers v. Commissioner*, 80 T.C. 914, 941 (1983).

## The Promissory Notes

Petitioners contend that the contribution of their own funds to the gold program and the use of borrowed funds for which they were personally liable, is proof that they possessed business purpose, i.e., a profit objective, for investing in the program. To the contrary, respondent argues that the promissory notes lack economic substance[30] and that petitioners' own funds merely represent payments by them for anticipated tax benefits.

We have found as a fact that the promissory notes were "financed" by use of a circular flow of money controlled by Myers. This was clearly an attempt to create the appearance of legitimate financing when, in fact, AMINTCO received no funds from the promissory notes,[31] and under its "compensating balance" arrangement with Kensington and Erylmore could receive such funds only to the extent investors made payments on the notes to Kensington. In

---

[30]With respect to whether this issue is properly before the Court in docket No. 31925-83, see note 33 *infra*.

[31]Cf. *Ford v. Commissioner*, T.C. Memo. 1986-104.

essence, the checks issued by Kensington to AMINTCO were a return to AMINTCO of its own funds, minus Kensington's operating expenses. In substance, no funds changed hands since the circulated funds were at all times under Myers' control.

Petitioners contend that they executed the promissory notes in good faith, and without knowledge of the circular flow of money or the "compensating balance"[32] arrangement between AMINTCO, Erylmore, and Kensington. Petitioners further contend that such promissory notes were valid negotiable instruments on their face which Kensington could have negotiated at any time, thus exposing petitioners to great financial risk. Petitioners argue, therefore, that the notes had economic substance as to them and should be recognized for tax purposes without regard to any financial machinations in which the promoters of the gold program may have engaged. Based upon this record, however, it is beyond belief that petitioners had no inkling of what was going on. The promissory notes in question included terms that petitioners could not have obtained at arm's length with a bona fide financial institution—a 10-year deferral on the repayment of principal, interest well below the then current market rate, nonrecourse with respect to interest, and the principal sum secured solely to the proceeds of what can only be described as a very risky venture. Even petitioners' expert admitted under cross-examination that at the times petitioners executed the promissory notes in question, such notes could not have been negotiated to a third party for more than 5 percent of their face amounts and, even if a buyer could be found, would probably have sold for much less. In any event, even a good-faith belief by petitioners that they had incurred genuine indebtedness

---

[32]Petitioners analogize the agreement between Kensington, Erylmore, and AMINTCO to that of a "compensating balance" arrangement between a lender (Kensington) and a homebuilder (AMINTCO) under which the lender releases to the homebuilder funds borrowed by the homeowner (petitioners) only as work on the home (the mine) is completed. However, unlike a true compensating balance agreement, the agreement in question here required the release of funds to AMINTCO only to the extent Kensington received payments with respect to investors' promissory notes, and not necessarily as AMINTCO completed mine development work. This is so because payments under the notes during the 6 years AMINTCO had under the mining agreements to complete development (and for 4 years thereafter) were linked to production of gold and silver. We, therefore, reject petitioners' attempt to somehow legitimize such an arrangement as a "compensating balance" agreement when closer scrutiny reveals it to be just another part of the paper facade creating the appearance that petitioners' notes had been funded.

would not affect our determination that the promissory notes in question lacked economic substance. See *Karme v. Commissioner*, 73 T.C. 1163, 1194 (1980), affd. 673 F.2d 1062 (9th Cir. 1982).

The record shows that AMINTCO retained possession of petitioners' promissory notes, and that Kensington received copies of such notes. Without possession of the original notes, Kensington clearly had no intention, nor did it have the ability, as petitioners contend it did, to either enforce the notes or to negotiate them to third parties.

Kensington was formed during 1980 by an associate of Myers, and all of its activities were carried out pursuant to Myers' directions. For most of November 1980 through March 1983, Kensington operated with only two permanent employees and some temporary clerical workers. We find very significant the fact that Kensington purportedly loaned in excess of $55 million without investigating the borrowers. Compare *Capek v. Commissioner*, 86 T.C. 14, 49 (1986). No payments were ever made on the notes by petitioners. AMINTCO held the notes for approximately 2 years, then returned them to petitioners. It is clear from these facts that the alleged loans lacked any economic substance whatsoever and were engaged in solely to inflate investors' tax deductions. The alleged loan transactions are, therefore, to be disregarded for Federal income tax purposes. *Falsetti v. Commissioner*, 85 T.C. 332 (1985). Also see *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985); *Moore v. Commissioner*, 85 T.C. at 107. Thus, petitioners are not entitled to any deductions based upon such allegedly borrowed sums.

*The Mining Property*

The mining property itself is strong evidence to show that the transaction did not have a realistic opportunity for economic profit.

The evidence is clear that the Shamrock and Encino Vivo properties could not have supported a mining program the size of that which Omni proposed. Even the most promising geologic report in evidence, that of petitioners' expert King W. Troensegaard, supports a finding of estimated reserves of only 1,500 tons at Shamrock and none at Encino Vivo. In

comparison, Omni purportedly sold in excess of 1.3 million tons of ore to 1980 gold program investors. Under the circumstances, we find that petitioners had no reasonable possibility of profiting economically from the disputed transactions other than through the promised tax benefits. *Rice's Toyota World, Inc. v. Commissioner, supra; Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981).

Having found that petitioners lacked business purpose, and that they had no realistic hope of profiting economically from the gold program except for tax benefits, we hold that the disputed transactions lack economic substance and are to be disregarded for Federal income tax purposes. We further hold that petitioners are not entitled to any deduction with respect to their cash payments to AMINTCO during the year in issue. Such amounts merely represent the fee which petitioners paid to purchase tax benefits and, consequently, are not deductible. *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d at 95, affg. on this issue 81 T.C. at 207 and 210.

In so holding, we have given thorough consideration to petitioners' contention that the gold program failed as the result of unforeseen circumstances and judgmental errors, and not by design as respondent asserts. Petitioners assert that Omni made a Herculean effort to provide a successful outcome for its gold program investors, pointing to the "back-up" mineral properties which Omni held at the time of the initial transactions, Omni's search for mineral properties to replace the abandoned Shamrock and Encino Vivo properties, and AMINTCO's activities at the Mary Murphy mine. The agreements executed by the parties, however, did not call for such actions by Omni or AMINTCO, and the evidence clearly shows that before executing such agreements petitioners did not consider the use of substitute mineral properties by Omni as part of the transaction. We note that petitioners took no action following Omni's abandonment first of the Shamrock and Encino Vivo properties, and then of Mary Murphy, remaining all but totally passive until their promissory notes were canceled and returned to them. When the dust finally settled ore block assignments had not been made and no mining had taken place. We find revealing Omni's explanation to

investors in Principals' Newsletter No. 5 dated December 14, 1981, that "performance is the best possible thing we can do to sustain the deduction claimed for the program." From these facts, it is clear that Omni's activities subsequent to the year in issue were merely "window dressing" intended to impart the appearance of substance to an already lifeless transaction. We, therefore, place no weight on such activities as proof of petitioners' business purpose or as evidence that the transactions in question had economic substance at the time they were entered into.

As further evidence of the economic substance of the gold program, petitioners point to the facts that AMINTCO purchased approximately $2 million worth of mining and milling equipment, hired in excess of 60 employees, and applied to appropriate governmental agencies for the permits necessary to commence mine development at Shamrock and Encino Vivo. Based on the entire record, however, we find these isolated facts of little assistance to petitioners' cause. Whatever intentions the promoters may have had with respect to AMINTCO's equipment and employees, there is no evidence of any intent on their part to ever develop or mine Shamrock and Encino Vivo. The facts show that Parrish clearly knew core drilling would be necessary to establish the existence of reserves on such properties and that he was informed by Mathis in July of 1980 that the surface sampling done by Osmer was suspect. In October 1980, Clem's geologic report confirmed that Shamrock and Encino Vivo were such poor prospects that core drilling was not warranted. Yet, Osmer was hired by AMINTCO in October 1980 and placed in charge of purchasing mine equipment and hiring employees. By April 1981, Osmer had been fired and the official decision to abandon Shamrock and Encino Vivo was made. Under the circumstances, and taking into account the labyrinth of paper transactions which formed the foundation of the gold program, we regard AMINTCO's activities merely as additional attempts by the promoters to put meat on the bones of a moribund transaction in the hope of sustaining tax deductions they had been paid to create. Such activities certainly added nothing to the substance of the transactions at issue.

Having found that such transactions lack economic substance for tax purposes, we need not consider other arguments by the parties.

Finally, we note that our decision has been reached without regard to the burden of proof in these cases, although such burden rests with petitioners as to matters raised in the notices of deficiency.[33] Rule 142(a).

*Additional Interest Under Section 6621(d)*

Section 6621(d) provides for an increased interest rate with respect to any "substantial underpayment" (greater than $1,000) in any taxable year "attributable to one or more tax motivated transactions." Sec. 6621(d)(1) and (2). The increased rate applies to interest accrued after December 31, 1984.[34]

By amended answers, respondent asserts the applicability of section 6621(d) to any portion of the underpayments in these cases attributable to a "valuation overstatement," as described in section 6659(c), or to "any loss disallowed by reason of section 465(a)." Sec. 6621(d)(3)(A)(i) and (ii). In his amended answers, respondent also makes a general prayer for the application of section 6621(d).

We have not reached the applicability of section 465(a) in these cases, and respondent has failed to show how the underpayments in these cases involved valuation overstate-

---

[33]Petitioners Patin assert that profit objective was not raised as an issue in the notice of deficiency and is therefore a new matter as to them for which respondent bears the burden of proof. Petitioners Patin further claim that the economic substance of the promissory note was not raised as an issue in the notice of deficiency and is therefore not in issue in their case. We find, however, that the language contained in the notice of deficiency issued to petitioners Patin is sufficiently broad to encompass both issues, since it states, in part, "Further, you have not established that you acquired an interest in any mineral property, that any mining expenses were paid or incurred, or that the claimed mining transactions occurred or occurred as claimed." Both issues are therefore raised in the notice of deficiency and petitioners bear the burden of proof. *Sorin v. Commissioner*, 29 T.C. 959, 969 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959). We also find no elements of surprise or detriment since petitioners were clearly informed of respondent's intention to pursue such issues at least 3 months before trial in respondent's status report filed with this Court and served upon petitioners. See *Sorin v. Commissioner, supra*; see also *Foster v. Commissioner*, 80 T.C. 34, 220-222 (1983), affd. in part and vacated in part on another issue 756 F.2d 1430 (9th Cir. 1985).

[34]Petitioners challenge on constitutional grounds the applicability of the increased interest rate under sec. 6621(d) to transactions entered into, and returns filed, prior to the date of enactment of such provision. We have considered and rejected similar arguments in *Solowiejczyk v. Commissioner*, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986).

ments within the meaning of section 6659(c).[35] Hence, we find that clauses (i) and (ii) of section 6621(d)(3)(A) are inapplicable in the instant cases.

However, for reasons which we explain below, we find section 6621(d) applicable in the instant cases to the extent the substantial underpayments result from sham transactions since they were without economic substance. Although respondent in his amended answers does not specifically address the applicability of section 6621(d) in the context of sham transactions, respondent does make a general claim under section 6621(d). Respondent raised both the sham and section 6621(d) issues prior to trial. Thus, petitioners have had a full opportunity to present any available evidence and all relevant arguments concerning both the sham issue and the applicability of section 6621(d). Accordingly, we find it appropriate in these cases to consider whether section 6621(d) applies to a sham transaction. Compare *Zirker v. Commissioner*, 87 T.C. 970 (1986), wherein we declined to consider the application of section 6621(d) to a sham transaction since the Commissioner in that case made no general claim under section 6621(d), but limited his allegations concerning such provision to the extent that a valuation overstatement was found; cf. *Johnson v. Commissioner*, 85 T.C. 469, 483 (1985), wherein we found that the taxpayers were not prejudiced by our application sua sponte of section 6621(d) based upon our finding of a valuation overstatement since the taxpayers in such case had a full opportunity to litigate the valuation issue.

In the instant cases, it is clear that petitioners are liable for the increase in the rate of interest pursuant to the provisions of section 6621(d) as evidenced by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2750 (the act). See *Price v. Commissioner*, 88 T.C. 583 (1987); *DeMartino v. Commissioner*, 88 T.C. 583 (1987). Section 1535 of the act specifically amends section 6621(d),[36] adding to the list of tax-motivated transactions "(v) any sham or fraudulent transaction." (This amendment is effective with respect to interest accruing after December 31, 1984, the original effective date of sec. 6621(d).) The Conference

---

[35]Respondent presented arguments concerning the applicability of sec. 6621(d) for the first time in his reply brief. We, therefore, will consider respondent's arguments on this issue only to the extent a basis therefor exists in his amended answers.

[36]See note 4 *supra*.

Committee report accompanying section 1535 of the act states in part:

> The conference agreement * * * makes a technical correction to the present-law provision that increases the rate of interest for tax-motivated transactions. * * *
>
> * * * Accordingly, the conference agreement, consistent with the legislative intent in originally enacting section 6621(d) in 1984, explicitly adds sham or fraudulent transactions to the list of transactions subject to this higher interest rate. * * *
>
> This clarification of present law applies to interest accruing after December 31, 1984, which is the date this higher interest rate took effect. This clarification does not apply, however, to any underpayment with respect to which there was a final court decision (either through exhausting all appeals rights or the lapsing of the time period within which an appeal must be pursued) before the date of enactment of this act. [H. Rept. 99-841 (Conf.) (1986), to accompany H.R. 3838 (Pub. L. 99-514), Vol. II at 796.]

We have held in the instant cases that the transactions in issue were without economic substance and, therefore, were economic shams. Such transactions are clearly "tax motivated transactions" within the purview of section 6621(d). Moreover, we note that even without taking into account the changes made by the recent act, respondent's temporary regulations treat as a tax-motivated transaction "any deduction disallowed for any period under section 165(c)(2) relating to any transaction not entered into for profit." Sec. 301.6621-2T, Q-4 and A-4, Proced. & Admin. Regs. (Temporary), T.D. 7998, 1985-1 C.B. 368, 49 Fed. Reg. 59394 (Dec. 28, 1984).[37] As part of our holding that the transactions lack economic substance, we have explicitly found that the disputed transactions were not entered into for profit. The losses from such transactions are thus not allowable under section 165(c)(2). Accordingly, we also find that pursuant to respondent's temporary regulations, the interest rate under section 6621(d) is applicable to the underpayments attributable to such disallowed losses. Section 301.6621-2T, A-5 of the temporary regulations provides for the method of computing the additional interest under section 6621(d).

*Section 6653(a) Additions to Tax*

Respondent determined additions to tax under section

---

[37]These temporary regulations were promulgated pursuant to sec. 6621(d)(3)(B), which grants the Secretary authority to specify types of transactions which will be treated as tax motivated in addition to those types specifically enumerated in sec. 6621(d)(3)(A).

6653(a) for negligence or intentional disregard of rules and regulations in the cases of petitioners Gomberg (docket No. 15992-84) and Skeen (docket No. 16937-84) in the amounts of $3,635.90 and $1,000, respectively. Petitioners bear the burden of proof on this issue. *Bixby v. Commissioner*, 58 T.C. 757, 791 (1972).

Petitioner Gomberg contests the addition on the ground that he relied upon his attorney and his accountant in choosing to invest in the gold program, citing for support *Hill v. Commissioner*, 63 T.C. 225, 251-252 (1974), affd. without opinion sub nom. *Tenner v. Commissioner*, 551 F.2d 313 (9th Cir. 1977) (reliance on accountants and attorneys), and *Moorman v. Commissioner*, 26 T.C. 666, 680 (1956) (reliance on attorney.) We find both cases distinguishable from the instant case. In *Hill* we found that the taxpayers had relied totally on experienced attorneys and accountants in structuring the transactions and in completing their tax returns. The *Moorman* case involved a taxpayer whose tax return had been prepared incorrectly by his attorney. In both cases, the taxpayers' income tax returns were prepared by a tax expert who was fully apprised of all facts relevant to the transactions in question. In the instant case, it appears that the attorney and the accountant consulted by Gomberg had no tax expertise, did not prepare Gomberg's income tax return, and had access only to the prospectus in formulating their advice to Gomberg. We note that Gomberg's failure to go beyond the information supplied by the promoters in the prospectus before entering the transactions in question was a crucial factor in our finding that he lacked business purpose with respect to such transactions. We think that "reliance" by Gomberg on advice rendered by his attorney and accountant based only upon the same scant information is not the type of reliance upon professional advice which was found in *Hill* and in *Mooreman* to overcome the addition to tax for negligence or intentional disregard of rules and regulations. Accordingly, respondent is sustained on this issue with respect to petitioner Gomberg.

Petitioner Skeen asserts that he was not negligent because he was introduced to the gold program and advised concerning it by Wurtz, a Certified Public Accountant, and because two of Skeen's co-workers, both with educational

backgrounds in mine engineering, spoke favorably of the gold program and decided to invest in it.

Skeen claims to have relied upon Wurtz for financial and tax advice. It was Wurtz who prepared Skeen's tax return for the year in issue. Skeen testified that he believed Wurtz had fully investigated the gold program "from the stand-point of 'was it real?'" including personal conversations by Wurtz with Myers and Parrish. On his Federal income tax return, Skeen deducted $30,000 in mine development ex-penses, broken into five categories pursuant to Wurtz' advice. Skeen testified that Wurtz had advised him that such categories were "separable and fairly safe categories to use."

Based upon this record, we hold that petitioner Skeen has failed to carry his burden of showing that in taking the disputed deductions, he did not do so negligently or without intentional disregard of respondent's rules and regulations. Although Skeen may have relied upon the advice of his tax accountant, we find that such reliance was unreasonable under the circumstances of this case.

We have found that Skeen entered into the transactions without a business purpose, but with the hope of a return on his investment solely from tax benefits. It appears from Skeen's testimony that he relied upon Wurtz' advice only as to whether the gold program and the deductions associated with it were plausible, and not as to their legality. In an obvious attempt to make such deductions more believable, petitioner reported them in five "safe" categories without knowledge as to whether such categories or the amounts reported in each category were correct. No reasonable and ordinarily prudent person would have done so under the circumstances. At the very least, such conduct constitutes negligence or intentional disregard of respondent's rules and regulations. Finally, with respect to petitioner Skeen's alleged reliance upon his co-workers' endorsement of the gold program, there is no reliable evidence in the record suggesting the exact nature of the advice, if any, that Skeen received from such individuals. Neither of Skeen's co-workers testified (see *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947)), and petitioner Skeen's testimony on the

subject is too general to support a finding in this respect. Accordingly, respondent is sustained on this issue.

> *Decisions will be entered for respondent in docket Nos. 31925-83, 7434-84 and 15992-84.*
>
> *Appropriate orders will be issued in docket Nos. 9257-84 and 16937-84 restoring them to the general docket for trial of the remaining issues in each case.*

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year here in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.