FREDERICK SHOTKIN AND RHODA SHOTKIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shotkin v. Commissioner
Docket No. 5575-84.
United States Tax Court
T.C. Memo 1988-263; 1988 Tax Ct. Memo LEXIS 293; 55 T.C.M. (CCH) 1091; T.C.M. (RIA) 88263; June 21, 1988; As amended June 22, 1988; As amended October 5, 1988 Frederick Shotkin, pro se. Michael Goldbas and Mitchell Hausman, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1978 and 1979 in the amounts of $ 11,606.74 and $ 2,469.90, respectively. *295 The issues for decision are 1) whether petitioners are entitled to claim certain deductions with respect to their investment in a medical device license for the "Pedi-Pulsor;" 2) whether petitioners are liable for additional interest under section 6621(c); [1] and 3) whether damages should be awarded under section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners, Frederick and Rhoda Shotkin, resided in Westport, Connecticut at the time of filing their joint petition. Rhoda Shotkin is a petitioner solely by reason of filing a joint return with her husband. All references to petitioner will be to Frederick Shotkin. During the years in issue, petitioner was a tax partner in the New York City law firm of Delson & Gordon and had been associated with this firm since the end of 1960. Petitioner has an extensive academic background, *296 having earned a Backelor of Science degree in Economics from the Wharton School of the University of Pennsylvania, a law degree from Harvard Law School and a graduate degree in tax law from New York University Law School. Prior to being employed as a tax attorney and attending law school, petitioner was employed as an accountant. Petitioner is a former member of the Federal Bar Council and served as Vice Chairman on the Council's Committee on Taxation. Petitioner has specialized in tax law for over 25 years. Petitioner first became aware of the [Text Deleted by Court Emendation] possibility of acquiring an exclusive territorial license to distribute the Pedi-Pulsor from World Medical Marketing, Inc. ("World Medical") sometime towards the end of 1978, when a client brought the matter to his attention. The Pedi-Pulsor was invented by Samuel N. Small and Harry S. Goldsmith, M.D. It is a device which offers a method of controlled exercise for the lower extremities of a bed-ridden patient. It is described as "a precision apparatus with two electromechanically-controlled foot pedals which may be operated either actively (by the patient's own foot pressure) or passively (by self-contained *297 motor)." It is used as a deterrent to thromboembolism, or blood clots in the calf muscle, and "functions essentially as an auxiliary blood pump to stimulate circulation in [that] area." [2]
The client, Mr. Briener, suggested that petitioner contact Mr. Jack Forgash ("Forgash"), a certified public accountant, who would provide him with details of the investment. Petitioner did in fact contact Forgash, who sent him material concerning the Pedi-Pulsor by letter dated November 20, 1978. Upon receipt and after review of the materials, petitioner discovered that the attorney involved with the Pedi-Pulsor investment was Mr. Matthew Magidson ("Magidson"), a boyhood friend of petitioners' [Text Deleted by Court Emendation] whom he had had contact with over the years. In fact, petitioner met his wife at Magidson's wedding reception. The document sent by Forgash to petitioner was a copy of the offering memorandum entitled "Product Information and License Network" pertaining to the Pedi-Pulsor franchise. The offering memorandum proposed *298 the purchase of a distributorship for the Pedi-Pulsor medical device in designated territories throughout the United States in exchange for annual royalties. Each franchise would include an exclusive geographic territory containing approximately 450,000 people. The 450,000 population unit was based on a survey conducted by a market survey company that concluded that this would be an ample population supply to warrant the success of the sale of the Pedi-Pulsor in that territory. The license, according to the offering memorandum, would commence on November 1, 1978, and terminate on December 31, 1988. The standard royalty payment for a license for a territory of that nature was $ 45,000 in 1978 and $ 90,000 in 1979 for a total of $ 135,000. The $ 45,000 payment in 1978 is in the form of a nonrecourse note; the $ 90,000 payment is comprised of a $ 10,000 check, a $ 5,000 recourse note and a $ 75,000 nonrecourse note. Following these payments, there were annual royalty payments: $ 90,000 in 1980, $ 50,000 in 1981 and $ 40,000 from 1982 through 1988. The offering memorandum highlighted the tax benefits of the investment in a chart entitled "Illustration of Tax Deductions and After Tax *299 Savings." This chart assumed that no sales would be made and income has therefore been omitted: DEDUCTIONS
50% BRACKET
Tax
Cumul.
Cash
Total
Total
Write Off
Tax
Cash Year
Outlay
Royalties
Interest
Available
Deductible
Multiple
Savings
Gain 1978
10,000
45,000
$   225
$ 45,225
$ 45,225
4.5
$ 22,612
$ 12,612
1979
5,000
90,000
$ 6,450
$ 96,450
$ 15,000
3.0
$  7,500
$ 15,112
Similar calculations were prepared for taxpayers in the sixty (60 percent) and seventy (70 percent) tax bracket. A 24-page opinion by World Medical's tax counsel, Magidson, outlined in detail the possible tax risks of the investment, including 1) the necessity for carrying on a trade or business within the meaning of the code; 2) the possibility that the Internal Revenue Service will disallow the deduction of that portion of the payment represented by nonrecourse note financing as not bona fide debt; 3) the tax consequences foreclosure of the note; 4) the application of the section 56 minimum tax on items of tax preference; 5) the application of maximum rate and personal service income under *300 section 1348 of the Code; 6) the possible application of section 183 of the Code; and 7) a discussion of the at-risk limitations of section 465 of the Code. The offering memorandum offered "an analysis of opportunity potential in the United States market," which outlined the potential sales market as including hospitals, nursing homes, medical clinics, school athletic departments and home use. The survey's summary of market potential was of a national scope, and no survey was done for each single territory. A section entitled "Example of Sales and Revenue for an Average Territory" determined, however, that the average territory would be comprised of hospitals, nursing homes, target consumers for home use and school athletic departments. They determined this based on an arbitrarily chosen level for each market sector, assuming 1) benefits of Pedi-Pulsor are genuine; 2) no technological advances are introduced into market; 3) a conscientious marketing and promotional campaign; and 4) a 10 percent hospital/nursing home market penetration and a 0.5 percent consumer/athletic department market penetration. A gross profit per average territory chart was attached which incorporated these *301 assumptions. It also offered a one-page synopsis of the competition of the Pedi-Pulsor in the marketplace. A brief description and comparison of each was included. The analysis specifically stated that no technical or scientific analysis of this device was included in the analysis and it also assumed that all regulations requirements would be achieved. The offering memorandum indicated that each licensee would be required to execute a "Licensee Warranty Statement" whereby he warrants that he will actively exploit the territory and develop a demand for the product. The memorandum explicitly stated that if the applicant failed to generate sufficient revenues to discharge his obligations to World Medical, World Medical could foreclose against the licensee's interest in the patents and applications in the assigned territory. The offering memorandum also pointed out that World Medical, the franchisor, had entered into a contract with Qualtrol Electronics, Inc. ("Qualtrol"), a New York Corporation, also with offices on Long Island, New York, whereby Qualtrol assigned all of the rights, title and interest in the United States patents to World Medical, [3] and World Medical contracted *302 with Qualtrol for Qualtrol to manufacture the device. [4] Qualtrol had acquired all of the rights to the Pedi-Pulsor patents for the United States from Samuel N. Small and Harry S. Goldsmith, the inventors of the device, and Bernard Friedman and Victor Kavits. In actuality, the agreement which gave World Medical the right to have Qualtrol manufacture this product was being held in escrow until World Medical paid Qualtrol the agreed-upon price. At that time, the agreement would be released out of escrow and would be in full force and in effect. No assurances were given in the offering memorandum that World Medical could engage a competent manufacturer in the event that Qualtrol was unable to fulfill its obligations or otherwise commence operations. Another undated and unexecuted document submitted to petitioner, however, was an agreement between Qualtrol Electronics and World Medical to the effect of a legal commitment on the part of Qualtrol to manufacture the Pedi-Pulsors upon their sale in the licensed territory. It is unclear whether petitioner received this document before December 8, 1978. *303 Around that same time petitioner allegedly examined a letter dated November 28, 1978, from Bernard Friedman, President of Uni-Med Industries Corporation ("Uni-Med"). Uni-Med is the sales and marketing organization of Qualtrol Electronics, established because Qualtrol was geared to electronic and not medical sales. The two companies operate in the same facilities. The letter contained information about Uni-Med and its activities regarding the Pedi-Pulsor, and ultimately suggested that "each territory be set up to handle its own sales by contacting medical salesmen, in the immediate areas, through local distributors." Petitioner also received a number of articles and brochures relating to the Pedi-Pulsor and its medical effects as a deterrent to thromboembolism, although once again it is unclear whether all were received prior to his investment. These articles include: (a) An article entitled, "Thromboembolic Disease -- A New Machine Fights the Silent Killer," written by Neil Shanman, Director of medical research for Uni-Med., and reprinted from the March 1978 issue of Business Advance; (b) A one-page black and white flyer entitled, "Pedi-Pulsor -- An Effective Deterrent to *304 Thromboembolism," published by Uni-Med; (c) A two-page (back and front) four color brochure entitled, "Pedi-Pulsor -- For the Prevention of Thromboembolism," printed by Uni-Med; (d) A four-page two color brochure entitled, "Pedi-Pulsor -- An Effective Deterrent to Thromboembolism," also printed by Uni-Med; and (e) An article entitled, "Thromboembolic Disease, Emphasis on Prevention," written by Harry S. Goldsmith, M.D., the inventor of the Pedi-Pulsor and an attending surgeon and assistant professor of surgery at Cornell University Medical College, reprinted from the "Medical Times" of August 1968, which article discussed the Pedi-Pulsor. In addition to reviewing the offering memorandum and the manufacturer's brochures, petitioner contacted Mr. Herman Glasser ("Glasser") for investment advice. Glasser was a friend and client of petitioner and they had known each other for about 20 years. Glasser was from 1966 to 1978, the Vice President and General Manager of Nuclear Associates Inc., a firm that develops and markets medical instrumentation primarily in what is called the imaging field which is diagnostic x-ray, nuclear sound and radiation therapy. In 1978, Glasser sold *305 Nuclear Associates to another company but remains employed in these same positions. Petitioner, believing Glasser to be an expert in medical products, called Glasser, described the Pedi-Pulsor to him, and asked him whether he would be willing to investigate the product and report back to petitioner on the product. In response to petitioner's request, Glasser checked with people in the field and obtained competitive literature [5] on products that were similar to the Pedi-Pulsor and doing the same function. Glasser testified he would "write away" for competitive literature by mail. He read the various articles written on the Pedi-Pulsor that petitioner had read. He spoke to the inventor of the Pedi-Pulsor, Dr. Goldsmith, whom he described as the "primary pusher of the product." He visited the manufacturer of the product to see if there were such a product in reality, and determined that there was, as he saw completed united on the floor, anywhere from on to a dozen. Glasser, after a review of the foregoing, wrote a letter to petitioner which indicated that the *306 manufacturer was capable of producing Pedi-Pulsors and that the device had a good potential medical market based on his experience and background. He completed his investigation during February 1979, subsequent to petitioner's investment. Glasser ultimately decided to acquire a license to distribute the Pedi-Pulsor in the territory of Massachusetts and retained petitioner as his legal advisor in the Pedi-Pulsor was partly based on a review of the financial analyses and projections in the offering memorandum. He did no independent financial analyses or projections. Based on this series of events, petitioner decided to purchase a license for the Pedi-Pulsor. Upon being given a list of territories then available, petitioner selected a license which included the State of Virginia, as well as counties in Maryland and North Carolina, because he felt that the close proximity to Washington, D.C. might mean that more hospitals and medical facilities dealing with the government might be located there and there would be a greater potential for the sale of the product. Petitioner did not do an independent market penetration study for his territory prior to his investment. Consequently, *307 on or about December 8, 1978, petitioner purchased the license to be the exclusive distributor of the Pedi-Pulsor in the aforementioned territories. In this connection, petitioner executed an "Application for License" and a "Licensee Warranty Statement" on that same date. The license agreement provides that consideration for the territory were royalties for half of the amounts that World Medical set forth as required in their standard deal: a) the 1978 royalty is satisfied by the issuance of a nonrecourse note in the amount of $ 22,500 due January 15, 1988; b) the 1979 royalty is satisfied by $ 5,000 in cash or check payable to Magidson, Pedi-Pulsor account, a recourse note in the amount of $ 2,500 due March 31, 1979 and payable to World Medical, and a nonrecourse note bearing interest at the rate of 6 percent per annum in the amount of $ 37,500 due January 15, 1988, payable to World Medical; and c) the royalties through the 1988 termination years are as follows: 1978
$ 22,500
1979
45,000
1980
45,000
1982-1988
20,000 per year
The royalty for 1980 and each succeeding license year would be payable by check on or before January 10 of each *308 calendar year and the balance by the licensees nonrecourse promissory note due January 15, 1988. The royalties for the 1978 and 1979 years were paybale upon closing on December 8, 1978. The term of the license agreement commenced on November 1, 1978, and terminated on December 31, 1988. Failure to make the annual royalty payments caused a termination of the license. But, even if the license were terminated due to petitioner's failure to pay the required yearly royalties after 1979, petitioner would receive a profit from sales made in his former territory. The residual profit for 1980 through 1984 would be 20 percent of the profits from sales, and 15 percent for the 1985 to 1988 period. Petitioner is not subject to personal liability in the event that he defaults on either of the nonrecourse notes. The license agreement provides that the licensee shall have to self promote and otherwise distribute the Pedi-Pulsor in designated territories in consideration for fixed annual royalties. As security for the payment of the aforementioned recourse and nonrecourse notes that were issued for royalties for the 1978 and 1979 years, petitioner granted an interest to World Medical per a *309 security agreement executed by petitioner and dated December 8, 1978, in the following: a) the license and b) 25 percent of the profit from any Pedi-Pulsor sales. In fact, the license agreement, the 1978 nonrecourse note, the 1979 nonrecourse note, the 1979 full recourse note and a check in the amount of $ 5,000 were delivered to World Medical on or about December 8, 1978. The "Licensee Warranty Statement" signed by petitioner provides: a) that petitioner desires to be considered as an applicant for an exclusive license to sell the Pedi-Pulsor in a designated territory; b) that petitioner does not wish to avail himself of the opportunity of obtaining from World any documents or other information that verifies the information contained in the offering memorandum; c) that petitioner warrants that he is not relying on the information contained in the "survey" that appears in the offering memorandum because said survey is based on certain assumptions which may prove to be incorrect; d) that petitioner must intend to actively promote the product in his designated territory; e) that petitioner will not seek World's assistance regarding the promotion of the product; f) that *310 World has not advised petitioner as to the manner in which he may develop demand; g) that petitioner may not realize the tax benefits discussed in the offering memorandum; h) that petitioner must intend to engage in the distributorship for profit or else jeopardize the tax benefits generated by this investment; i) World has no financial or operating history; j) the acquisition of a Pedi-Pulsor license is a speculative acquisition that involves a high degree of risk of loss by petitioner; k) World will not use any of the proceeds from selling Pedi-Pulsor distributorships to promote the Pedi-Pulsor or otherwise attempt to create demand for the product; and l) petitioner has the sole responsibility for promoting the product.
A letter also dated December 8, 1978, indicated that Uni-Med would represent, without additional charge, all licensees at national shows and provide promotional materials as well. In that same letter, it was also stated that the licensee "will either personally or through others actively attempt to sell the product. The failure to do so would * * * jeopardize his tax position." This letter was from Magidson. The record contains no evidence that *311 a contract to this effect was ever entered into between petitioner and Uni-Med. Subsequent to the execution of the foregoing documents and the acquisition by petitioner of the Pedi-Pulsor license, petitioner contacted Glasser and asked Glasser to arrange, on his behalf, whatever might be required to exploit and market the product, and to make sure that each party involved in the transaction was doing what they were supposed to do. Glasser agreed to do this. Petitioner was advised by Glasser by a letter dated February 20, 1979, that the Pedi-Pulsor will only sell with proper marketing and that Uni-Med, the company recommended by World Medical, did not have a firm marketing plan or program. Specifically, Uni-Med's representative had not hired a marketing manager and was too busy with other problems to do so. After Glasser's letter to petitioner of February 20, 1979, petitioner was contacted by Glasser on or after July 9, 1979, in that he received a copy of a letter that Glasser mailed to World Medical complaining about the lack of marketing efforts from Uni-Med. Thereafter, petitioner received a copy of a letter written by Glasser to World Medical dated September 13, 1979, requesting *312 that a marketing manager be hired. In addition, this letter indicated that Glasser had engaged a sales representative for his Massachusetts territory and that he wanted a copy of the type of agreement that World Medical would want to execute with said representative. The sales representative for Glasser's territory was Linley Marketing and Research ("Linley") of Londonderry, New Hampshire. Shortly thereafter, petitioner engaged Linley by agreement dated October 18, 1979, to be his exclusive sales representative for a term of 5 years cancellable by either party upon proper notice. The Linley sales representation agreement provides Linley as the representative who would provide qualified personnel to canvas and solicit orders for the Pedi-Pulsor in petitioner' area. The representative commission on the sale would be 15 percent. Petitioner never met anyone associated with Linley nor did anyone on his behalf negotiate the sales representation agreement referred to above. It is unclear whether a sales representative was ever named for petitioner's Virginia-Maryland-North Carolina region. Linley sold no units for petitioner in these territories. Approximately 10 months after petitioner *313 engaged Linley, he was contacted by a general partner of a firm called Medco, Mr. Robert Heil, Jr., who requested that Medco be appointed as sales agent for Virginia. Medco has licenses for 90 Pedi-Pulsor territories. Petitioner signed a sales representation agreement on November 3, 1980, with Medco that provided: a. Medco would supervise sales representatives and act as a liaison between sales representatives and the manufacturer, Uni-Med. b. In addition, Medco would process purchase orders, prepare shipping documents, collect payments, maintain bank accounts, maintain financial records and perform other minor administrative services. c. Medco would also prepare the licensee's Schedule C, to be included with his tax return (Form 1040) each year. d. In consideration for the above services, Medco's commission is $ 1,050 per unit sold outright and $ 3,097 per unit sold on a revenue sharing basis. On or about October 4, 1980, petitioner received a series of communications from Medco, now renamed Medpar, [6] describing its experiences and efforts to engage in the marketing of the Pedi-Pulsor. These memoranda were essentially in the form of news releases to Pedi-Pulsor *314 licensees. It appears that petitioner never spoke with Mr. Heil and never met Mr. Heil personally until August 1981. Petitioner did not open or maintain a bank account for his Pedi-Pulsor distributorship. Petitioner did not open or maintain financial books and records for his Pedi-Pulsor distributorship. Petitioner has never sold a Pedi-Pulsor nor has one ever been sold on his behalf. Petitioner did not pay the recourse note that was due on March 31, 1979 for 1979 royalties. World Medical did not seek the enforcement of the 1979 full recourse notes. Petitioner allegedly did not pay the full recourse note because World had failed to provide the marketing services and assistance that petitioner determined World Medical indicated they would provide. Petitioner did not pay royalties for the 1980 year and, therefore, discontinued his franchise. He thereafter only retained a residual interest in profits made on the sale of Pedi-Pulsors in his territory. Glasser discontinued his royalty payments in 1980. Petitioner never physically examined a Pedi-Pulsor *315 medical device. OPINION The primary issue for decision is whether petitioner is entitled to certain deductions related to his Pedi-Pulsor territorial license activities. Respondent's disallowance of such deductions is based on the determination that petitioner's license activities were not engaged in for profit within the meaning of section 183. Respondent also asserts, in the alternative, that the nonrecourse notes executed by petitioner with regard to the Pedi-Pulsor license were not bona fide indebtedness for tax purposes and had no economic substance. Respondent's determinations are presumed correct, and petitioner bears the burden of proving otherwise. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Section 183 provides that if an individual does not engage in an activity for profit, the deductions arising out of such activities shall not be allowed except as provided in section 183(b). That section allows only those deductions which are not dependent upon a profit objective, e.g., interest and taxes, and the balance of the deductions to the extent that gross income from the activity exceeds deductions attributable to such expenses as interest *316 and taxes. Sections 183(b)(1) and (2). Petitioner's right to deductions is dependent upon his showing that his Pedi-Pulsor distributorship "either constituted a trade or business or was undertaken and carried on for the production of income." Essential to such a showing is a demonstration that petitioner had "an actual and honest objective of making a profit." See, generally, Beck v. Commissioner,85 T.C. 557, 569 (1985) and extensive list of cases cited therein. As noted above, the parties argued and briefed the issue of profit objective pursuant to a section 183 analysis.[7] However, in Rose v. Commissioner,88 T.C. 386, 414 (1987), we adopted an objective test under which transactions involving "generic tax shelters," [8] as we find in this case, are disregarded if they are devoid of economic substance. In the case of a generic tax shelter, "the presence or absence of a profit objective is to be determined from the examination of certain objective factors which tend to indicate whether or not the disputed transaction had economic substance." See Horn v. Commissioner, 90 T.C.    (May 10, 1988); Rose v. Commissioner, supra at 414. *317 [9] This test incorporates several of the factors found relevant under section 183. Under the Rose analysis, "the objective and subjective merge into an approach in which the objective test incorporates factors considered relevant in cases decided under section 183, as well as concepts underlying those statutes providing for the deductions (sections 162 and 167) and credits (sections 38 and 48) * * *." Rose v. Commissioner, supra at 414-415. *318 Under the unified approach of Rose, the following factors have been considered in determining whether an activity is lacking in economic substance: 1) the lack of arm's-length dealings; 2) petitioner's investment activities; 3) projected revenues versus tax benefits; 4) the relationship between fair market value and price; and 5) the structure of the financing. See Patin v. Commissioner,88 T.C. 1086, 1117-1122 (1987); Rose v. Commissioner, supra at 415-422. For our purposes, we will focus on those factors which we find relevant to the facts of this case to determine whether there was economic substance to the transaction. Petitioner asserts that the evidence in this case clearly establishes that he acquired the license to distribute the Pedi-Pulsor with the objective of making a profit. Petitioner contends that both the form of the transaction and the testimony at trial proved that petitioner entered into the transaction with a profit objective. Respondent, on the other hand, contends that the objective facts surrounding the transaction including petitioner's lack of knowledge of the subject area, his failure to make an independent and *319 businesslike pre-investment investigation, the passive nature of his involvement, both before and after the license agreement was signed, and the nature of the debt used to pay for the license, show that petitioner did not have the requisite profit objective when he entered into the Pedi-Pulsor transaction. We agree with respondent. There is ample evidence in the record illustrating petitioner's total indifference to the economic success of his Pedi-Pulsor distributorship. In fact, the manner in which petitioner conducted the activity negates any inference that he might have been interested in economic profit. [10] The fact that petitioner executed the required paperwork in connection with his license activities does not conceal his lack of involvement with all aspects of his investment. See Herrick v. Commissioner,85 T.C. 237 (1985). [11]
Petitioner's dealings with others related to the transaction highlights the rationale of our conclusion. Petitioner, an experienced tax attorney, has no background in medicine *320 or experience in the medical device industry, but spoke with and communicated by mail with several individuals he felt were qualified to assess the investment. While we agree that petitioner did contact several individuals concerning his investment, none of those contacted could be deemed as a satisfactory substitute for an independent, thorough expert investigation of the device. Petitioner could not reasonably rely on Magidson for investment advice. Magidson was not a medical device expert, but tax counsel for World Medical, the promoter of the Pedi-Pulsor distributorship. Magidson had an interest in seeing that distributorships were licensed in as many territories as possible, and could not give an "objective" opinion. Moreover, Magidson had no medical background and the articles supplied by Magidson to petitioner were either written by the inventor of the Pedi-Pulsor or the manufacturer of the Pedi-Pulsor, and hardly translated into an expert evaluation of the device or more precisely, an independent evaluation of the device. The only credible advice petitioner could have received was from Glasser. Glasser had been involved in the development and purchase of medical devices *321 in connection with his personal business and to that extent was clearly more familiar with the general investment subject. However, the record indicates that while Glasser did conduct an investigation and provide petitioner with an evaluation of the product, most of that investigation could only have been conducted subsequent to petitioner entering into his license with World Medical. Glasser testified that he completed his investigation near the date that he provided petitioner with a written report. The only written reports in the record from Glasser to petitioner close to the date of petitioner's investment were letters dated February 20 and 21, 1979. This would be almost 2 months after petitioner entered into his license with World Medical. While both Glasser and petitioner testified that Glasser telephoned petitioner with investment advice before he entered into his license agreement, [12] this would have given Glasser only 2 weeks to conduct a complete investigation of the Pedi-Pulsor. Glasser himself testified that most thorough investigations take between 1 and 3 months to complete. Glasser also testified he received competitive literature by "writing away." We do not *322 believe Glasser could have mailed away and received competitive literature, reviewed it and made a decision within a 2-week period. Moreover, the competitive literature in the record consisted of one pamphlet. Most of Glasser's investigation involved a review of the same offering memorandum and the same literature available to petitioner. Glasser, in fact, specifically stated that based on the numbers in the Pedi-Pulsor prospectus and where the market was going to be for this type of product he "decided that financially it would be a good, viable product on the selling price that was determined for the product." One can only question why a tax attorney would need another's advice to reach this conclusion. Moreover, to the extent Glasser investigated the medical effectiveness and competitiveness of the Pedi-Pulsor, much of what he *323 relied on was information from the offering memorandum and inventor which was hardly objective. We have absolutely no objective evidence of which people in the "field" Glasser spoke with about this device. The fact that Glasser is currently under audit for his Pedi-Pulsor distributorship makes such blanket statements about his investigation suspect without further elaboration or corroborating evidence. Even if Glasser were somehow able to conduct a thorough investigation of the product and report back to petitioner before December 8, 1978, and provide petitioner with some information petitioner could not have determined for himself, petitioner's total lack of involvement subsequent to his entering into the license with World Medical bears out that petitioner had no intent to make a profit and was motivated by other than business considerations to enter into his investment. The manner in which petitioner conducted the marketing activities related to the promotion and marketing of the Pedi-Pulsor belies any finding that he looked at his distributorship as a "business" rather than a tax benefit. Despite his high level professional background, petitioner was totally unbusinesslike *324 with respect to the promotion and marketing of his investment for such services. Petitioner once again looked to Glasser to do whatever might be required to exploit and market the product, but rarely communicated with him during this period and did not communicate with those hired to promote the product other than to enter into an agreement. Petitioner engaged a market and research company by agreement in October 1979, almost 1 year after entering into his license agreement, despite the fact that the offering memorandum, Glasser, Magidson and all other sources stressed that proper marketing was crucial to the success of the distributorship. Petitioner used the same marketing company that Glasser used in regard to his Pedi-Pulsor distributorship, a company which was located in New Hampshire close to Glasser's territory in Massachusetts, but quite far from petitioner's. One can only wonder why petitioner hired a New Hampshire company to market a product in Virginia, Maryland and North Carolina. There is no evidence furthermore that the company ever hired a sales representative for petitioner to distribute and promote the Pedi-Pulsor in his territory, and from the record it appears *325 that petitioner never inquired about this lack of sales representation. In fact, when questioned about Linley Marketing at trial, petitioner did not even know where they were headquartered. Finally, the agreement with Linley was not negotiated. This does not suggest that petitioner acted as a prudent businessman would under similar circumstances. Approximately 10 months after petitioner engaged Linley, he was contacted by the general partner in a firm called Medco/Medpar, a Mr. Robert Heil, and entered into an agreement with them to promote the Pedi-Pulsor in Virginia on November 3, 1980. There is no evidence indicating that a specific sales representative was ever appointed for this territory. In any case, petitioner's license was terminated on January 10, 1980, for failure to pay his royalty on that date. To the extent Medpar was involved as of November 1980, it related to petitioner's residual interest in his territory. [13] Medpar never sold a Pedi-Pulsor for petitioner. Petitioner also testified that he has not spent any money promoting, advertising or marketing the product. Despite the fact that Glasser informed petitioner of several problems with the marketing of the *326 product, petitioner was never prompted to act. This complete lack of involvement in the transaction indicates that petitioner was not concerned with the economic success of the activity, especially in light of the fact that promotion of the product was crucial to its success. Petitioner's purported reliance Glasser to assist petitioner with the promotion of the Pedi-Pulsor in petitioner's territories does not detract from the fact that an interested investor would have made it his business to establish solid, regional sales representation. Petitioner never visited any of his *327 territories. Most disturbing is that petitioner was not even aware that his territory included counties in North Carolina and Maryland, as well as Virginia, despite the fact that this was obvious from a brief review of the license agreement. Another indication of the lack of economic substance of this transaction is the structure of the financing of the Pedi-Pulsor license. The presence of deferred debt that is in substance or in fact not likely to be paid is an indication of lack of economic substance or an exaggeration thereof. Knestch v. United States,364 U.S. 361 (1960); Rose v. Commissioner,88 T.C. 386, 419 (1987); Waddell v. Commissioner,86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988). As discussed, petitioner was granted a license to distribute the Pedi-Pulsor in a specific geographic area in exchange for annual royalties due on the closing date of December 8, 1978, as follows: a $ 22,500 nonrecourse note due January 15, 1988; a $ 37,500 nonrecourse note due January 15, 1988; a $ 2,500 recourse note due March 31, 1979; and a $ 5,000 check. Upon closer inspection, it becomes evident that this arrangement *328 was tax-motivated. First, the consideration for the 1978 license fee of $ 22,500 entitled petitioner to market the product for only 23 days, the days remaining in the 1978 year, and was satisfied entirely by a nonrecourse note payable out of the profits from Pedi-Pulsor sales. However, there was no likelihood that there would be any sales from Pedi-Pulsor in 1978 or that the nonrecourse note would be paid at all in 1978. This, as respondent points out, guarantees petitioner that a large tax loss could be reported for the 1978 tax year since no Pedi-Pulsor sales were predicted to offset the purported license fee deduction. Consequently, there was absolutely no business purpose, absent tax consideration, to the issuance of the nonrecourse note for 1978 royalties. See Surloff v. Commissioner,81 T.C. 210, 237-238 (1983). Second, another suspect aspect of the structure of this transaction was that a $ 5,000 cash fee was tendered in 1978 but applied to the 1979 license fee, along with a $ 2,500 recourse note and a $ 37,500 nonrecourse note. The transaction was apparently set up this way because the "at-risk" rules of section 465 would be in effect for the 1979 tax *329 year, and by applying the 1978 cash payment to the 1979 license fee, petitioner would receive the maximum tax benefits from the tender consideration. Accordingly, even though paid in 19978, the application of the cash payment to the 1979 license fee was designed exclusively for the purpose of generating tax benefits. Finally, it should be noted that the full recourse note that petitioner was required to pay pursuant to the license royalty agreements was never paid. Petitioner's reasoning for failing to pay the $ 2,500 fee was that World Medical failed to provide the assistance and sources of marketing they indicated they would provide. While not up to par, some national marketing services were provided and clearly the local promotion was far more crucial to the success of the product. Moreover, there is no evidence in the record which indicates World Medical had actually entered into such an agreement with petitioner, only Magidson's letter. In any case, petitioner did not bring suit against World Medical, and World Medical did not seek the enforcement of the note against petitioner. Moreover, petitioner effectively terminated his distributorship as of January 10, 1980, by *330 not paying the annual license fee. Under these circumstances and taking into account all the evidence of the record, it is evident that tax considerations rather than economic considerations were the foundation of the structure of this venture. Petitioner, whose cash outlay totalled $ 5,000, received a tax benefit of $ 27,500 ($ 22,500 + $ 5,000) for deductions taken in 1978 and 1979. Therefore, the transaction generated a loss to cash investment ratio of over 5 to 1. Other factors also indicate petitioner's cavalier attitude towards economic profit. Petitioner did not open and maintain a bank account, books or records for his distributorship. Petitioner was indifferent to whether the product received FDA (Food and Drug Administration) approval or U.L. listing. Petitioner was not aware that another licensee was also granted exclusive rights to distribute the Pedi-Pulsor in petitioner's Maryland territories until after entering into his sales representation contract with Medpar in late 1980. Petitioner contends, nevertheless, that the fact that he did not accept the standard deal offered by World Marketing in its prospectus is an indication that he was interested in the "economics" *331 of the transaction. Petitioner negotiated a special arrangement for himself under which he was given a territory having a population of close to 5,000,000 people, rather than the standard territory of 450,000 people, for half the standard royalty fee set forth in the prospectus for the 450,000 population. This deal, however, appears too good to be true. We have no objective facts surrounding the alleged "negotiation," on the record other than petitioner's testimony that he negotiated with the President of World Marketing for such an arrangement, i.e., $ 67,500 for a territory that would normally cost closer to $ 1,000,000. We do not find this brief explanation credible. More likely, petitioner received the discount for promoting the deal to his clients, six of whom entered into a license agreement with World Medical in 1978 or 1979. Petitioner received a $ 4,500 commission in connection with the promotion and selling of these distributorships, which he applied against the legal fees due from each client for representing them as counsel in the transaction. One can question why petitioner was too busy to ensure proper marketing but not too busy to promote the license itself. *332 We could go on and list several other factors which indicate petitioner's lack of profit motive; however, based on what we have already discussed, we determine that petitioner was indifferent to whether he would make a profit from his distributorship, and that the real benefit to him was the large tax deduction generated as a result of his small cash payment. See Gray v. Commissioner,88 T.C. 1306, 1326 (1987). Petitioner is accordingly not entitled to any allowable deduction because the transaction lacked economic substance. We must next determine whether petitioner is liable under section 6621(c) for interest on the underpayment at 120 percent of the statutory rate. Under that section, additional interest will be due on interest accruing after [Text Deleted By Court Emendation] December 31, 1984, see Patin v. Commissioner,88 T.C. 1086, 1129 (1987), if a substantial underpayment [14] is attributable to a "tax motivated transaction." Section 6621 (c)(3)(A)(v) includes within the definition of a "tax motivated transaction" any sham or fraudulent transaction, and the term "sham" includes a transaction which has no economic substance. Cherin v. Commissioner,89 T.C. 986, 1000 (1987); *333 Patin v. Commissioner, supra at 1125. As we have already found that petitioner's Pedi-Pulsor distributorship investment was devoid of any economic substance, the increased rate of interest is applicable to the disallowed losses petitioner claimed pertaining to such investment. Finally, we consider the imposition of damages against petitioner pursuant to section 6673. Section 6673 provides that this Court may award to the United States damages not in excess of $ 5,000 "Whenever it appears * * that proceedings * * * have been instituted or maintained by the taxpayer primarily for delay, [or] that the taxpayer's position in such proceeding is frivolous or groundless * * *." We have already determined that petitioner' transaction was devoid of economic substance, and that petitioner, an experienced tax attorney, did not enter into his investment with a profit motive. Based on a review of the entire record, we believe that petitioner knew from the start that there was no basis in law or in fact for the deductions he claimed, and *334 that his total reliance upon Glasser to provide for his own profit motivation in no way changed this result. Petitioner should not have pursued such a frivolous and groundless action, and the imposition of damages in the amount of $ 5,000 is warranted. See Horn v. Commissioner, 90 T.C.    (May 10, 1988), for a detailed summary of the section 6673 cases and the reasons why Congress provided for such damages. Accordingly, we award damages to the United States under section 6673 in the amount of $ 5,000. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. This description is found in the "Product Information and License Network" Offering Memorandum provided by World Medical to potential investors. ↩
3. The 1978 and 1979 fixed annual royalties payable by the licensee to World Medical will be used by World Medical to discharge its obligations to Qualtrol. ↩
4. At least two other companies manufactured this device for the licensees subsequent to Qualtrol. ↩
5. The competitive literature Glasser reviewed consisted of one pamphlet which promoted a competitive device. ↩
6. Medco was required to change its name to Medpar because another company already had incorporated under the name Medco. ↩
7. In determining whether an activity is engaged in for profit, a nonexclusive list of some relevant facts is analyzed pursuant to the regulations issued under section 183. The factors are: (1) the manner in which the taxpayer carries on the activity; 2) the expertise of the taxpayer or his advisors; 3) the time and effort expended by the taxpayer in carrying on the activity; 4) the expectation that assets used in the activity may appreciate in value; 5) the success of the taxpayer in carrying on other similar or dissimilar activities; 6) the taxpayer's history of income and losses with respect to the activity; 7) the amount of occasional profits, if any, which are earned; 8) the financial status of the taxpayer; and 9) whether elements of personal pleasure or recreation are involved. Section 1.183-2(b), Income Tax Regs↩
8. A generic tax shelter is defined as a tax shelter possessing some or all of the following characteristics: 1) tax benefits are the focus of the materials used to promote the program; 2) the investors accept the price in terms of the leases without negotiation; 3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to the tangible property included as part of the packages; 4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transaction in question; and 5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or substance. See Rose v. Commissioner,88 T.C. 386, 412 (1987). Petitioner's investment in the Pedi-Pulsor distributorship involved to some extent each of these characteristics. Where these characteristics are apparent in a specific transaction, it is necessary to determine whether sufficient business purpose existed for the taxpayer to obtain the claimed tax benefits. Rose v. Commissioner, supra."In any case where a taxpayer establishes a business purpose, i.e., an actual and honest profit objective, we may still recharacterize the terms of the transactions to accord with what we perceive to be the reality of the situation." Rose v. Commissioner, supra↩ at 414. 9. For a summary of the holdings of the cases discussing whether or not a transaction lacks economic substance, see James v. Commissioner,87 T.C. 905, 918↩ (1986). 10. See Ragghianti v. Commissioner,T.C. Memo. 1988-125↩. 11. See Powell v. Commissioner,T.C. Memo. 1986-369↩. 12. The letter dated February 21, 1979, summarizing Glasser's initial investigation, refers to a letter petitioner wrote Glasser dated January 29, 1979. One must assume that it was this letter which requested investment information, but petitioner did not recall what this letter asked for, could not find it, and did not enter it into evidence. ↩
13. While petitioner terminated his license as of January 10, 1980, we may consider events that took place after that time if they indicate profit motive. See Taube v. Commissioner,88 T.C. 464↩ (1987). While Medpar was involved in promoting this product and apparently made some effort to do so, and while petitioner had a residual interest after this time, we do not believe this representation is sufficient to prove a profit objective on behalf of petitioner. Moreover, the fact that Pedi-Pulsors were actually sold somewhere, sometime, does not change our determination of this issue. 14. For purposes of section 6621(c), substantial underpayment means an underpayment which exceeds $ 1,000. See section 6621(c)(2). ↩